IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re PHARMACY BENEFIT MANAGERS | : | Civil Action No. 06-1782 |
| | : | |
| ANTITRUST LITIGATION | : | |
| ———————————————————— | | |
| | | |
| BRADY ENTERPRISES, INC., et al. | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | Civil Action No. 03-4730 |
| | : | |
| MEDCO HEALTH SOLUTIONS, INC. | : | |
| | : | |
| Defendant. | : | |
| ———————————————————— | | |
| | | |
| NORTH JACKSON PHARMACY, INC. and | : | |
| C&C INC., d/b/a/ BIG C DISCOUNT DRUGS, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | Civil Action No. 06-4305 |
| | : | |
| CAREMARK RX INC., *et al*, | : | |
| | : | |
| Defendants. | : | |
| ———————————————————— | | |
| | | |
| NORTH JACKSON PHARMACY, INC., | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No. 06-4114 |
| | : | |
| EXPRESS SCRIPTS, INC., *et al*, | : | |
| | : | |
| Defendants. | : | |
| ———————————————————— | | |

NORTH JACKSON PHARMACY, INC.,        :
                                     :
        Plaintiff,                   :
                                     :
    v.                               :          Civil Action No. 06-4115
                                     :
MEDCO HEALTH SOLUTIONS INC.          :
                                     :
        Defendant.                   :

**MEMORANDUM**

**C. Darnell Jones, II J.**                          **January 18, 2017**

> **I.    Introduction**

This long pending multidistrict litigation involves antitrust claims brought by several Plaintiffs against companies engaged in the business of providing pharmaceutical benefits management services.[1]  In the various suits, Plaintiffs allege that Defendants engaged in one or more price fixing conspiracies that resulted in reducing the amounts reimbursed to independent pharmacies for prescriptions they filled for participants of the drug benefit plans administered by the Defendants.  In Civil Action 06-4305 (hereinafter "the lead case" or "*Caremark*"), Plaintiffs North Jackson Pharmacy, Inc. ("North Jackson") and C&C Inc., d/b/a/ Big C Discount Drugs ("Big C") (collectively "Plaintiffs") allege antitrust claims on behalf of a class of independent pharmacies[2] ("IPs") against Defendants Caremark Inc. (n/k/a/ Caremark, L.L.C.) and related entities (collectively "Caremark").  Plaintiffs allege two illegal conspiracies to control the prices

---

[1] The lead case, assigned Civil Action No. 06-4305 in this District, was originally filed in 2003 in the United States District Court for the Northern District of Alabama, and the operative Second Amended Class Action Complaint ("SAC") was filed on June 22, 2004.  The Judicial Panel on Multidistrict Litigation consolidated the above captioned cases for pre-trial proceedings in the United States District Court for the Eastern District of Pennsylvania in 2006.  The MDL was previously assigned to two other judges.  (*See* Judicial Panel on Multidistrict Litigation MDL 1782 Transfer Order dated August 24, 2006 (attached hereto as App'x A).)

[2] Plaintiffs define "independent pharmacies" as having five or fewer locations.  "Chain pharmacies" are defined as having six or more locations.  (SAC ¶ 1.)

paid to IPs in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, namely that: (1) Caremark and other Pharmacy Benefit Managers ("PBMs") conspired with their clients — health plans run by employers, labor unions, health insurers and health maintenance organizations — to fix prices paid to IPs; and (2) Caremark conspired with other PBMs including Express Scripts, Advance PCS[3] and Medco in a horizontal price fixing scheme to set reimbursement rates at unconscionable and punitively low levels.

Presently awaiting decision in the lead case are a Motion for class certification pursuant to Fed. R. Civ. P. 23, and a Motion by Caremark to exclude Plaintiffs' expert evidence. Presently awaiting decision in Civil Action 06-4114 ("*Express Scripts*"), a class action brought by North Jackson against Express Scripts, Inc. ("Express Scripts") and Civil Action 06-4115 ("*Medco*"), a class action brought by North Jackson against Medco Health Solutions, Inc. ("Medco"), is a Motion to decertify a class that was certified before the case became part of the MDL. Presently awaiting decision in Civil Action 03-4730 ("*Brady*") is a class certification Motion similar to that pending in *Caremark*. For the following reasons, Caremark's Motion to exclude expert evidence shall be granted, Plaintiffs' Motions for class certification in the lead case and in *Brady* shall be denied, and the class previously certified in *Express Scripts* and *Medco* shall be decertified.

---

[3] After this action was initially filed in the United States District Court for the Northern District of Alabama, AdvancePCS was acquired by Caremark. *See In re Pharmacy Benefit Managers Antitrust Litig.*, 582 F.3d 432, 434 n.1, 437 (3d Cir. 2009) (noting acquisition occurred in March 2004).

II.     **The Class Certification Record in** *Caremark*[4]

    a.     **Background**

North Jackson is an IP in Jackson County, Alabama owned by Bryan Hicks.  (*See* No. 06-4305, ECF 1, SAC ¶ 9; *see also* 06-MD-1782, ECF 248-2, Declaration of Bryan Hicks ("Hicks Decl.") ¶ 1-2[5]; ECF 261-3, Hicks June 29, 2005 Dep. at 1.)  Big C is an IP in Jackson County, Alabama owned in part by Dexter Cordes.  (See SAC ¶ 10; ECF 261-4, Cordes June 28, 2005 Dep. at 1.)  Plaintiffs seek to represent a class of "[a]ll independent pharmacies within the boundaries of the United States who contracted with any of the named Defendants, . . .  to dispense and sell prescription drugs for any client payors" during the period of 1993 to the present (the 'Class Period')."  (SAC ¶ 35.)  According to a declaration provided by Gregory Madsen, Caremark's Senior Vice President, Retail Services, in 2006 there were about 25,000 pharmacies that Caremark considered to be IPs.  (ECF 261-5, Madsen Decl. ¶ 12.)  IPs are dispersed throughout the United States, including in both large urban settings and rural areas.  (*See id.* ¶ 15.)  Some IPs may have significant buying power, while others may not, depending on the competitive conditions of each particular market.  (*See id.* ¶¶ 13, 15.)

PBMs like Caremark contract with entities that sponsor prescription drug benefit programs such as employers, labor unions, health insurance plans, and health maintenance organizations (collectively "Plan Sponsors") to act as a third-party administrator for the Plan Sponsors' programs.  (*See* ECF 260-2, Aug. 2005 FTC Study *Pharmacy Benefit Managers:*

---

[4] An Order entered on January 27, 2012 permitted Plaintiffs in *Caremark* to conduct additional class certification discovery and submit an amended Motion for class certification. (*See* ECF 171.)  That Order also provided that, for the sake of efficiency and judicial economy, the class certification motions filed in the other MDL cases would be held under advisement while discovery proceeded in the lead case.

[5] Unless otherwise noted, all other ECF citations are to 06-MD-1782, the master MDL file for this litigation.

*Ownership of Mail-Order Pharmacies*, at 1-3 ("2005 FTC Study").)  To fulfil their contracts with Plan Sponsors, PBMs contract with pharmacies in order to build networks of retail pharmacies that can provide the Plan Sponsors' enrollees with convenient access to prescriptions.  (*See id.* at 1.)

Plaintiffs allege two distinct antitrust conspiracies under Section 1 of the Sherman Act wherein Caremark conspired to reimburse IPs at a lower rate than what it paid to Chain Pharmacies.  First, Plaintiffs allege that Defendants are agents for their clients, the health plans, in fixing prices to IPs (the "Plan Sponsor Conspiracy").  (*See* SAC ¶¶ 66, 71; ECF 248 at 1 ("First, Plaintiffs allege that Caremark and other PBMs reached an unlawful agreement with their client payors.").)  Plaintiffs allege that various health plans acted through Defendants in a horizontal conspiracy to lower the prices that they paid to IPs for prescription dispensing services.[6]  (*See* SAC ¶ 71.)  Second, Plaintiffs allege that PBMs conspired with one another in a

---

[6] *See also* SAC ¶ 5d ("[Caremark acts] as a conduit for the Client Payors to engage in horizontal restraint of trade by removing the need and existence for any market whereby they must compete in order to secure the services of pharmacists to service their insured.  The removal of this market and the conferring of the aggregate power to negotiate these services upon [Caremark] and other PBMs amounts to horizontal price fixing as it allows for the stabilization and repression of the fees pharmacists would be able to charge in a free and open market.")

After the case was filed in Alabama, it was transferred to the Northern District of Illinois.  (*See* No. 04-cv-05674 (N.D. Ill.)  On August 12, 2005, that Court issued an order holding that the Plan Sponsor conspiracy claim was subject to rule of reason analysis.  *See North Jackson Pharmacy, Inc. v. Caremark Rx, Inc.*, 385 F. Supp. 2d 740 (N.D. Ill. 2005) ("the Illinois Opinion").  There has not yet been a judicial determination whether the inter-PBM conspiracy is to be adjudicated under the per se rule, the rule of reason or a quick-look analysis.  For purposes of the pending motions only, it is assumed that the per se rule applies to that claim.  Accordingly, the discussion *infra* related to product and geographic market definitions and market power refers only to the rule of reason claim.

It should be noted that in the introduction to their certification submission, Plaintiffs assert that "*[b]oth* conspiracies involve horizontal arrangements subject to per se analysis, not evaluation under the rule of reason."  (ECF 248 at 1 (emphasis added).)  They go on to argue at length that the Illinois Opinion, issued before the case became part of the MDL, erroneously determined that the rule of reason applied to the Caremark-Plan Sponsor conspiracy claim (*see*

"horizontal price fixing scheme[]" to "set[] reimbursement rates for Plaintiffs at unconscionable and punitively low levels which are far below the level that would exist in a true competitive market and, further, below any measure of Plaintiffs' costs including their variable, marginal, and/or actual costs," and by engaging in certain other conduct (the "PBM Conspiracy").  (*Id.* at ¶¶ 75-76; ECF 248 at 1 ("Second, Plaintiffs allege that Caremark conspired with other PBMs including Express Scripts, Advance PCS and Medco in violation of Section 1.").)

Plaintiffs allege that Caremark violated the antitrust laws through the following practices:

- Fixing and artificially depressing the prices to be paid to independent pharmacies for prescription drugs;
- Accepting "kickbacks" such as rebates, discounts, and other undisclosed incentives from drug manufacturers in return for placing the

---

ECF 248 at 16-22) and assert that "the Court should reject any attempt by Caremark to justify its agreements to fix prices." (*Id.* at 22.)  The determination that the rule of reason and not the per se rule applied to the Plan Sponsor conspiracy claim is the law of the case, and Plaintiffs fail to couch their argument in terms that acknowledge that significance.  This failure is somewhat odd considering that law of the case issues have previously arisen in the MDL with Plaintiffs successfully asserting before the United States Court of Appeals for the Third Circuit that the prior transferor judge erred in failing to grant law of case status to a ruling issued by a transferee judge.  *See In re Pharmacy Benefit Managers Antitrust Litig.*, 582 F.3d 432, 439 (3d Cir. 2009) (stating that the "'[l]aw of the case rules have developed "to maintain consistency and avoid reconsideration of matters once decided during the course of a single continuing lawsuit."''" (quoting *Casey v. Planned Parenthood of Se. Pa.*, 14 F.3d 848, 856 (3d Cir. 1994) (quoting 18 Charles A. Wright, Arthur R. Miller, Edward Cooper, Federal Practice and Procedure § 4478 at 788 (2d ed.1981))).

Under law of the case doctrine, the discretion of a court to revisit its own ruling or that of a coordinate court is limited to "extraordinary circumstances" (1) where new evidence is available, (2) where a supervening new law has been announced, (3) where there is a need to clarify or correct an earlier, ambiguous ruling, or (4) where an unambiguous ruling might lead to an unjust result.  *In re Pharmacy Benefit Managers Antitrust Litig.*, 582 F.3d at 439 (internal quotations and citations omitted).  Because Plaintiffs cite to no new evidence or change in the law, the Illinois Opinion's discussion of why the per se rule should not apply to the Plan Sponsor conspiracy claim is unambiguous, and the result that the rule of reason should apply thereto is not unjust, there is no cause to revisit the ruling.  Moreover, to the extent that Plaintiffs argue that the ruling was incorrect, we fully agree with the Illinois Opinion's reasons for determining that the conspiracy alleged between Caremark and the Plan Sponsors should be governed under the rule of reason.  *See* Illinois Opinion, 385 F. Supp. 2d at 749 (because "the bundle of services provided by Caremark reflects a cooperative arrangement between Caremark and the Plan Sponsors that has efficiency-enhancing potential" rule of reason analysis was appropriate).

manufacturer's drugs on Caremark's formulary and "pushing" these drugs on physicians and pharmacists regardless of whether the drug is the least expensive and most therapeutically effective drug available and using these undisclosed kickbacks to set anticompetitive prices for drugs filled through their in-house mail order pharmacies;

- Conspiring and using their combined monopolistic market power to force unconscionable reimbursement rates on "member pharmacies" with the specific intent to manipulate prices. These reimbursement rates are far below the rates that would apply in a true competitive market. Additionally, Caremark and other PBMs unilaterally change the reimbursement rates without negotiating with the member pharmacies and force this new rate upon them;

- Acting as a conduit for the Client Payors to engage in horizontal restraint of trade by removing the need and existence for any market whereby they must compete in order to secure the services of pharmacists to service their insured. The removal of this market and conferring of the aggregate power to negotiate these services upon Caremark and other PBMs amounts to horizontal price fixing as it allows for the stabilization and repression of the fees pharmacists would be able to charge in a free and open market;

- Diverting health plan members to its mail order business and to its parent company, CVS, by prohibiting retail pharmacies from providing more than a 30-day supply of drugs, while allowing its own mail order pharmacies to provide 90-day supplies, through direct prohibitions on certain network pharmacies preventing them from dispensing refill and follow-up prescriptions, and by undercutting the copay the network pharmacy is required to charge for each 30-day refill;

- Removing the physician and pharmacist from their vital role in the health care equation. Caremark "pushes" its formulary drugs on health plan members, by-passing the physician and the pharmacist, regardless of whether the formulary drug is the cheapest or most therapeutic drug in that class;

- Requiring pharmacists to contact the prescribing physician and patient if a non-formulary drug was prescribed, and encourage a change to a formulary drug and to provide the prescribing physician with a list of alternative formulary drugs;

- Requiring member pharmacies to use and pay for common software systems to process claims that are designed to maintain the detrimental pricing schemes; and

- Imposing unreasonable and unnecessary additional costs on member pharmacies, including charging them a fee for each claim processed and a fee when the pharmacy seeks information from Caremark.

(ECF 181 at 4-5; SAC ¶ 5.)

The Federal Trade Commission in the 2005 FTC Study explained the mechanics of how

PBM reimbursement to retail pharmacies operates. (2005 FTC Study at 1-5.) PBMs contract

with entities that provide prescription drug benefits to their enrollees, such as employers, labor union plans, and other entities, to manage those entities' prescription drug coverage benefits. (*Id.* at 2.)  PBMs then establish networks of retail pharmacies to fill prescriptions for the Plan Sponsors' members.  (*Id.* at 3.)  Retail pharmacies receive revenue from the consumer in the form of co-payments collected at the point of sale and from the PBM in the form of reimbursements of the dispensed drug's ingredient cost plus any dispensing fee associated with filling the prescription, less the copayment ("the Reimbursement Rate").  (*Id.* at 4.)

As found in the Illinois Opinion, PBM administration of prescription drug benefit programs achieves a number of efficiencies.  *See id.*, 385 F. Supp. 2d at 749 (stating "the arrangement between Plan Sponsors and Caremark clearly has efficiency-enhancing potential. Caremark specializes in various functions of benefit plan administration and is likely able to achieve economies of scale in the performance of those functions that would otherwise be unavailable to Plan Sponsors.  And the creation of retail pharmacy networks, which necessarily involves the setting of reimbursement rates, undoubtedly contributes to the success of that larger endeavor.  What is more, there is a real question whether, on the other side of the coin, the arrangement actually has any countervailing anticompetitive consequences.")   Unlike Plan Sponsors, PBMs are able to specialize in handling a variety of administrative functions involved in running prescription drug benefit programs, such as processing claims, maintaining patient records, creating and managing formularies, and negotiating discounts or rebates with drug manufacturers.  *Id.* (*see also* Madsen Decl. ¶8; 2005 FTC Study at 1-2.)  PBMs thus allow for collective reimbursement rate negotiations, avoiding the unworkable situation where each Plan Sponsor would need to negotiate separately with each pharmacy, an alternative that even the named Plaintiffs recognized would be inefficient and unmanageable.  (Cordes Dep. at 328:5-8

(testifying that Big C does not have sufficient personnel to negotiate individually with each Plan Sponsor); Hicks Dep. at 446:14-448:3 (testifying similarly).)

Pharmacies contract with numerous PBMs and Plan Sponsors, and it is not unusual for a pharmacy to contract with more than 100 different PBMs and Plan Sponsors. (Madsen Decl. ¶ 14.) Pharmacies often also participate in multiple networks offered by a single PBM. (*See* Hicks Dep. at 87:21-89:18 (testifying that North Jackson is a member of 10 or 20 PBM networks, with some managed by the same PBM).) The networks may offer differing reimbursement rates, but the rate for each network is generally expressed according to the industry practice described in the 2005 FTC Study. (Hicks Dep. at 92:8-12; Cordes Dep. at 157:14-23, 175:4-14 (noting same PBM can have multiple networks, with differing reimbursement rates); *see also* Def. App'x A and B (summarizing different rates from North Jackson's and Big C's network agreements).) Caremark generally offers three kinds of pharmacy networks: (1) "access networks," which enable members to fill prescriptions at a pharmacy but do not specify particular rates; (2) "pricing networks," which provide for specified reimbursement rates and dispensing fees; and (3) "custom pharmacy pricing networks," which are tailored to a Plan Sponsor's particularized requirements. (Madsen Decl. ¶¶ 4-6.) Reimbursement rates and dispensing fees differ from one custom network to another and also within a custom network. (*See id.*) Caremark solicits a pharmacy's participation in any network that Caremark believes the pharmacy would be interested in joining, including any and all custom networks that have been established to serve clients in the pharmacy's local geographic area. (*Id.* ¶ 10.) The pharmacy can join all, none, or some of the networks that it is invited to join. (*Id.*)

According to Big C's Jeff Stewart, approximately 75% of Big C's prescription drug business comes from third-party payors. (ECF 181-3, Aug. 28, 2015 Decl. of Jeff Stewart at ¶

3.)  Medicaid accounts for approximately 20%, Express Scripts accounts for 10%, and all other third-party payors account for 54% of his business.  (*Id.*)  In 2004, Big C's average revenue per prescription dispensed was $47.00.  (*Id.* ¶ 5.)  Stewart asserts that the number of prescriptions dispensed by Big C has increased, due largely to picking up additional customers after another independent pharmacy in his area closed.  (*Id.* ¶ 7.)  He asserts that this other business failed due to low reimbursement rates and that Caremark continues to pay low reimbursement rates and divert plan members to mail order service.  (*Id.* ¶¶ 7-8.)  According to North Jackson's owner Bryan Hicks, Express Scripts accounts for approximately 25% of all prescriptions dispensed. (ECF 250-1, Aug. 28, 2015 Decl. of Bryan Hicks at ¶ 3.)   His approximate overhead per prescription filled is $5.00.  (*Id.* ¶ 4.)  Hicks has attempted to negotiate reimbursement rates with Caremark and other PBMs, but his counteroffers were refused or ignored.  (*Id.* ¶ 6.)  He asserts that Caremark's reimbursement rate is far below that of the Alabama and Tennessee Medicaid agencies.  (*Id.* ¶ 8.)  For example, the Alabama Medicaid rate includes a dispensing fee 3 – 3½ times that paid by Caremark.  (*Id.*)  He has experienced a steady and dramatic decline in his gross margin on third-party payors, going from 8.94% in 1999 to 5.48% in 2015.  His current gross profit per prescription is $2.07, down from $6.18 in 1999.  His average revenue per prescription dispensed in 2004 was approximately $34.00 (*Id.* ¶ 9.)  While he too has picked up additional customers due to other independent pharmacies closing, he asserts that his reduced profit is due to low reimbursement rates, and Caremark diverting customers to mail order.  (*Id.* ¶¶ 11-12.)

### b.        Expert Submissions

### 1.        Dr. Charles D. Cowan

To support their Motion, Plaintiffs submit multiple expert reports authored by Charles D. Cowan, Ph.D. and Paul J. Seguin, Ph.D.[7]  (*Id.*)  Dr. Cowan attempts to examine the allegations in the complaints "and consider whether it is possible to test the claims made by plaintiffs." Having determined that it is possible, he proposes several tests that can be conducted that are specific to the allegations, lays out a proposed methodology for doing so, and proposes develop methods for calculation of damages.  (*Id.* at 2.)  He offers several hypotheses that he asserts "can be tested."[8]  (*Id.*)  The report does not conduct the tests since, Cowan claims, it would not be

---

[7]   Dr. Cowan is Managing Partner of Analytic FocuSLLC, a company headquartered in Birmingham, Alabama that provides litigation support and expert witness services including the measurement and mitigation of risk for financial intermediaries.  (ECF 181-2, March 15, 2006 Expert Report of Charles D. Cowan ("2006 Cowan Report") at 1.)  He is an adjunct professor in the School of Business and the School of Public Health at the University of Alabama - Birmingham.  Dr. Cowan's background covers 40 years of research and study in the areas of statistics, economics, and their application to business problems.  His firm conducts research for legal matters, including litigation support and expert witness services when requested.  His work focuses on measurement of risk for financial intermediaries.  His area of practice also includes support of Federal and State agencies needing economic and financial analysis to pursue their missions.  Prior to founding Analytic Focus, he served as Chief Statistician for the Federal Deposit Insurance Corporation, Director for Price Waterhouse where he headed the Financial Services Group in the Quantitative Methods Division, and 12 years of service at the U.S. Bureau of the Census where he was responsible for the evaluation of the Decennial Census and held the title of Chief of the Survey Design Branch.  He also previously served as a professor in the Business School at UAB, as a research professor at the University of Illinois, and in other academic and professional positions.

[8] His hypotheses are:

1) dispensing fees paid to plaintiffs are significantly less than fees paid to larger pharmacies
2) ingredient fees paid to plaintiffs are significantly less than fees paid to larger pharmacies
3) net returns (dispensing fees + ingredient fees - charges and addons [sic]) are significantly less than fees paid to larger pharmacies
4) variability between prices paid to plaintiffs by PBMs for services is less than

"possible to do so without information from the defendants."  (*Id.* at 3.)  Instead, he merely "presents the tests I believe will be helpful in determining whether the claims of the plaintiffs hold."  (*Id.* at 4.)

By way of historical background, Cowan notes that, until the mid-1980s, most pharmacy benefits were offered through indemnity plans whereby the consumer paid the cash price for drugs then sought partial reimbursement — usually 80% — from their health plan.  (*Id.* at 7.)  He asserts that the long term impact of PBMs has been to drive a very large number of IPs out of business.  In the 1970s and 1980s, the number of pharmacies in the United States was fairly stable or rising, but after 1992, the number started to decline rapidly, at a time when small businesses in other sectors of the economy were "booming."  (*Id.*)  Conversely, the number of chain outlets, mass merchandize outlets and supermarket outlets for pharmaceuticals, and their sales volumes, grew each year.  (*Id.* at 8.)  IPs lost market share to these other outlets in every year after 1993.  (*Id.* at 9.)  Over this time, mail order pharmacy sales grew as well, but only the sales by IPs declined.  (*Id.* at 10; Chart 3.)  Cowan notes that,

If other sources were loosing [sic] share to mail order, then it would be harder to

---

variability in prices paid to larger pharmacies in the insured market for services
5) levels and variability between prices paid to plaintiffs by PBMs for services is less than levels and variability in prices paid to larger pharmacies in an open market for services - a comparison between pricing by all pharmacies in sales to the uninsured versus pricing by all pharmacies in sales to the insured
6) contracts for independent pharmacists rejected by the PBMs are equal in value to contracts accepted by PBMs from larger pharmacies (PBMs acting against self-interest)
7) simultaneous choices by PBMs of Average Wholesale Prices (AWPs) to use from a set of AWP rates favor PBMs rather than their clients, the payors, and simultaneously hurt independent pharmacies out of proportion to large pharmacies
8) RxHub can be used to share pricing information between PBMs through standard analytical techniques.

(2006 Cowan Report at 2.)

12

argue that the independent pharmacists were hit differentially.  Chain stores and supermarkets were actually picking up market share in pharmacy sales while the share for independents declined.  The share for supermarkets and mass merchandisers remained relatively flat.

(*Id.*)  He opines that,

The conclusion to be drawn from these charts is that the independent stores suffered relative to the chain stores in the time period that the PBMs emerged and grew as the intermediary controlling force for pharmaceutical sales.  During this period we know that the number of chain and other stores grew, and that sales of pharmaceuticals grew tremendously.  Finally, we know that independents rely more on sales of pharmaceuticals than do chain stores.

(*Id.* at 13.)

After reciting the Plaintiffs claims — noted above and contained in SAC ¶ 5 — Cowan opines that the claims "have the effect of price-fixing, eliminating competition, indirect collusion among the PBMs, and an attempt to drive independent pharmacies out of the market."  (*Id.* at 24.)  He states that, other than the copay, "all other fees are determined contractually with each pharmaceutical company, in one or more contracts that each pharmacy has with each PBM.  These values differ from contract to contract."  (*Id.* at 25.)  Cowan opines that "[w]hen there are more sellers and there is unequal strength between the sellers, relative market power is a major determinant of pricing.  If there is a well-defined relationship between market power and the fees charged, then it should be possible to determine what fees would be in a market where prices are not artificially depressed."  (*Id.*)

On the cost side of the equation, he notes that Plaintiffs do not claim that

reimbursement rates are always below the marginal cost, nor has the claim ever been that reimbursement rates are below average cost.  The claim is that the reimbursement rates are too low, that sometimes they are below the marginal cost, and that they are differentially low for independent pharmacists. Under these claims, independent pharmacists are harmed if their reimbursements are below what they should have been in a truly competitive market.  The harm is reduced revenue.

13

(*Id.* at 27.)  Cowan offers several criteria to determine whether IPs are being treated differentially

after other factors, such as size, are accounted for.  (*Id.*)

First, he proposes to determine if the average of "dispensing fee contract values falls

below the bounds established in determining the size to fee relationship," opining that this would

indicate that prices have been fixed and fees paid to IPs are artificially low.  (*Id.* at 34.)  He

proposes that, if there is no natural variability in the contract values between IPs and PBMs — in

other words all contracts with the PBMs vary much less than they do for the PBMs' contracts

with pharmacies with six or more stores — then there is also an indication of price collusion.

(*Id.* at 35.)  He has specifically refused to specify the form of the regression tests that may be

used to study these criteria since he did not have access to data that would tell him what forms to

run.[9]  (*Id.* at 37.)

---

[9] Cowan does, however, opine that the following possibilities of analyses need to be
considered:

a)      Analysis of covariance - permits the use of continuous and categorical
explanatory variables
b)      Discriminant function analysis - a system of regressions with specific
characteristics designed to cluster members of the population (e.g. independent
pharmacists in the South vs. chains in the South vs. independent pharmacist in the
West vs. chains in the West, etc.)
c)      Multivariate Analysis of Covariance - multiple simultaneous predictions
using analysis of covariance (e.g. one for each drug in one large regression),
d)      SUR - Seemingly unrelated regression - used to run separate regressions
and then relate the error terms, an alternative to simultaneous equations
e)      Canonical correlations - multiple dependent variables on the right hand
side of the equation with the same set of explanatory variables on the left t hand
side
f)      Hierarchical linear models (known in econometrics as variable parameter
regressions) - allows the parameters in the regression to vary as random variables
that are a function of other common predictor variables.

(2006 Cowan Report at 38.)

14

Second, he proposes to specify a regression to examine reimbursement rates and dispensing fees and then allow the coefficients in the model to vary according to drug type. He opines that the goal of the analysis "is to discover, after accounting for all other available information, whether there is a pattern of practice that compensates independent pharmacist below the rate one would expect." (*Id.* at 39.) In so doing he would hold constant the pharmacies' network distinctions, the varying rates of reimbursement for different drug types, market concentration, and other factors. (*Id.*)

Finally, Dr. Cowan opines that his proposed testing methodology "leads to a method for computing damages." (*Id.* at 50.) He proposed eight different ways in which damages can be measured. First, he would calculate the

> average difference between independent pharmacy dispensing fees and the average predicted based on the model described based on size of pharmacy. Multiply this difference times all prescriptions processed by a PBM in the last four years. This calculation can be done at a more refined level for generics, brand drugs, each PBM individually, and by other factors important to understanding the difference between paid and predicted.

(*Id.*) Dr. Cowan asserts that, if tests show that IPs "are making less than would be expected given the number of stores, then the coefficient d [i.e., some particular drug such as Nexium] will be negative and a measure of the dollar loss for independent pharmacists on each sale of Nexium. If we multiply "d" times the total sales, we have a measure of damages just from sales for this type of drug. We can repeat this calculation for each type of drug and sum to obtain a total estimate of damages for artificially low dispensing fees." (*Id.*) To calculate the damages resulting from different reimbursement rates, he proposes using the same calculation, except that the coefficient would measure the difference in the percent of the average wholesale price ("AWP") offered to IPs versus chains. He would then apply this gap in AWP to sales to obtain total damages.

Second, to test whether ingredient fees paid to IPs are significantly less than fees paid to larger pharmacies, he would calculate the average difference between IP ingredient fees and the average predicted based on the model described based on size of pharmacy.  He would then multiply this difference times all prescriptions processed by a PBM in the last four years, specifying that this calculation could be done at a more refined level for generics, brand drugs, each PBM individually, and by other factors important to understanding  the difference between paid and predicted.  (*Id.* at 51.)  Third, to test whether "net returns," defined as dispensing fees plus ingredient fees minus charges, are significantly less than fees paid to larger pharmacies, Dr. Cowan would calculate the average difference between IP total compensation and the average predicted by his model, multiplied by all prescriptions processed.  (*Id.*)  Fourth, he would examine the variability between prices paid to IPs by PBMs for services since, he asserts, "if independents were able to compete fairly, then their variability of compensation would be higher, and in turn then would be compensated at a higher level too."  (*Id.*)  He would use a formula to find the increase in fees resulting from increased variation and apply the increase to all prescriptions written in the last four years.  (*Id.*)  Fifth, he would examine the average IP price and average non-independent price paid by uninsured consumers and compare that ratio to a similarly calculated ratio for insured customers.  He opines that on a "level playing field" the ratios would be equal, but if IPs are unable to compete fairly, the "insureds" ratio would be less than the "uninsureds" ratio.  The product of the ratios multiplied by the IPs' revenue would equal the damages resulting from the lack of a level playing field.  (*Id.* at 52.)  Sixth, Dr. Cowan proposes that, for IPs rejected for participation by PBMs, he would compute the average revenue ratio as the revenue that would have been received for rejected contracts and multiply this ratio by the total revenue for the IPs to obtain "corrected" revenue.  (*Id.*)  Seventh, since PBMs choose

AWPs from a set of AWP rates that favor PBMs rather than their third party payor clients, and which also hurt IPs out of proportion to large pharmacies, Dr. Cowan proposed to use "average AWPs (since real AWP is unknown as they are multiple estimates of same value). Compute fees based on average AWP instead of chosen AWP and compute difference on each transaction - sum of differences is damages." (*Id.* at 53-54.) Finally, he proposes using the same method described in his fourth alternative, but substituting pricing information from RxHUB. (*Id.* at 54.)

### 2.    Dr. Paul J. Seguin

Paul Seguin, Ph.D., submitted a report for the Plaintiffs entitled "Antitrust Violations by Pharmacy Benefit Managers" on September 23, 2014 ("2014 Seguin Report"), in which he outlines "not only how Cowan's tests were feasibly empirically implemented, but how these tests provide evidence of anti-competitive behavior, provide an estimate of damages and demonstrate injury to identifiable class members." (*Id.* at 1.) Specifically, Seguin focuses on the first three tests proposed by Dr. Cowan: (1) dispensing fees, (2) ingredient fees, and (3) net returns paid to Plaintiffs, each of which he opines are significantly less than those of larger pharmacies. (*Id.* at 3.)

Using Caremark data that was unavailable to Dr. Cowan, Dr. Seguin opines he is able to identify that IPs received reimbursements that "were both economically importantly and statistically reliably different than those received by pharmacies that are members of a chain for both years for which data was provided — 2005 and 2008. Specifically, IPs received, on average $1.73 less per non-generic (or "brand-name") prescription filled." (*Id.* at 1.) Seguin calculates that the aggregate damages suffered by the putative Class for those two years is $23,011,622. (*Id.*) He asserts he can apply the same methodology to all years deemed relevant and for other PBMs, as well as allocate damages among each class member. (*Id.*) Using data

from 2002-2012 to update Cowan's analysis of IP market share, Seguin opines, consistent with Cowan's findings, that the trend of a reduced market share for IP's continued during this period. He interprets this evidence as being consistent with Plaintiffs' hypothesis that PBMs' anti-competitive practices have a detrimental effect on the competition for the dispensing and sale of prescription drugs that has manifested itself as an elimination of the growth of IPs while their Chain counterparts continue to grow. (*Id.*)

Dr. Seguin was provided with transactional data from Caremark containing all non-generic prescriptions filled for customers who had a prescription plan managed by a PBM for the two calendar years of 2005 and 2008. In total, 78,543,701 records were provided. (2014 Seguin Report at 3.) He used data on the total reimbursements received by pharmacies for filling a particular prescription and the quantity of drugs filled for that prescription. (*Id.*) He supplemented these data by creating a set of additional variables that, he opines, capture the locational-specific economic and competitive environment. He used 2000 Census data to calculate income — in the form of the median incomes for each ZIP, and populations for each ZIP. (*Id.* at 4.) He further calculated the number of pharmacies in a ZIP — specifically the number of storefronts, not just the number of different chains — and the number of pharmacies within a chain. (*Id.*) He then created an indicator variable representing whether or not the number of pharmacies within a chain was five or fewer, assigning a value of "1" if a particular pharmacy's name has five or fewer unique addresses associated with it and a value of "0" if a pharmacy's name has greater than five unique addresses. (*Id.*)

Next, Dr. Seguin estimated a regression model[10] using data on prescriptions for Lipitor, where there were 1,745,461 prescriptions filled across all pharmacies in 2005 for Caremark PBM members.  (*Id.*)  Using ordinary-least squares estimation, he determined that for this drug-year combination reimbursement to pharmacy chains was, on average, $6.42 plus $2.73 per pill dispensed.[11]  (*Id.* at 5.)  However, for pharmacies with five or fewer outlets, the result was $5.42 plus $2.73.  (*Id.* at 6.)  The $1.00 difference is a function of changing the indicator variable from "1" to "0."  (*Id.* at 5.)  Using his estimate of $\delta$ as -$1.00 — or, more precisely, $0.99985 — Seguin calculates aggregate damages incurred by IP class members for Lipitor in 2005 by multiplying the per-fill damages estimate of $1.00 by the number of Lipitor prescriptions filled by all IPs, 300,148, resulting in damages of $300,103.45 for that drug-year combination.  (*Id.* at 6.)  He opines that he can further calculate the damages incurred by each class member by multiplying the drug-year specific damage number (-$1.00) by the number of Lipitor prescriptions filled by each Pharmacy Name for that year.  (*Id.*)

---

[10] Dr. Seguin's model is expressed as the equation: $Reimbursement = \alpha + \delta\, I_{NPCFF} + \beta\, Quantity + \varepsilon$, where *NPCFF* is the indicator variable for the Number of Pharmacies within a Chain is Five or Fewer.  He states that, since the indicator variable *NPCFF* takes on values of either zero or one, the above equation can be re-written as:

$$Reimbursement = \begin{cases} \alpha + \beta\, Quantity + \varepsilon, & if\ NPC > 5 \\ (\alpha + \delta) + \beta\, Quantity + \varepsilon, & if\ NPC \leq 5 \end{cases}.$$

(*Id.* at 4.)

[11] Dr. Seguin opines that,

Using ordinary-least squares estimation, the estimates of $\alpha, \beta$ and $\delta$ are $6.43, $2.73 and -$1.00.  The t-statistic associated with the estimate of $\delta$ is -25.5.  Common measures of suitability confirm that the model is appropriate as $R^2$ = .761, so over three-quarters of the total variation in *Reimbursement* is explained by the two variables and the F-statistic, that measures that the joint-significance of the two variables exceeds 2.7 million.

(*Id.* at 5.)

Dr. Seguin also opines that he can similarly calculate damages across all non-generic prescriptions filled in 2005 that were filled at least 120 times by:

a)      running such regressions for each non-generic drug name, and

b)      multiplying the estimate of the reimbursement differential coefficient, $\delta$, by the number of fills for that formulation in 2005 by Independent Pharmacists and then

c)      summing the damages across all 608 different drugs filled at least 120 times in 2005. This can be expressed mathematically as:

$$\sum_{drug=1}^{608} \left\{ \hat{\delta}_{drug} \, x \, Fills\,(NPCFF = 1)_{drug} \right\}$$

where:

  i.    $\hat{\delta}_{drug}$ is the estimate of $\delta$ from a regression for that particular *drug* for 2005 (e.g., -\$1 for Lipitor), and

  ii.    $Fills\,(NPCFF = 1)_{drug}$ is the number of times that prescription drug was filled by an IP in 2005 (e.g., 300,148 for Lipitor).

Dr. Seguin states that this sum, across all non-generic drugs filled at least 120 times for Caremark PBM members in 2005 equals \$12,308,601. Damages for the non-generic drug names filled for Caremark PBM members in 2008 equal \$10,703,061. Damages across the two years aggregate to \$23,011,622. (*Id.* at 6-7.)

Dr. Seguin then set out to test the "robustness" of his findings. He opines that his finding is robust for a number of alternative statistical specifications including, but not limited to, (a) adding variables for income, population, and number of pharmacies in a ZIP; (b) including the natural logs (ln) of these three variables that control for cross-sectional differences in the competitive environment facing each individual pharmacy; (c) estimation via weighted-least-squares using (the inverse of) numerous combinations of the dependent variables listed above; (d) estimating models where the slopes varied with *NPCFF* which represents a direct test of

Cowan's test asking whether "ingredient fees paid to plaintiffs are significantly less than fees paid to larger pharmacies."  (*Id.* at 7-8.)

Dr. Seguin has also reviewed data on market share to support Dr. Cowan's conclusions that market share for IPs fell and the share for chain pharmacies grew.  He finds that the chain group had an increase in the relative number of outlets of 19.2% over the period from 2002 to 2012, or a compounded annualized growth rate ("CAGR") of 1.8%.  For the same period, the data indicate that the market share of IPs fell with a CAGR of -0.15%.  (*Id.* at 10.)  Seguin opines that the decline in the number of IP outlets over this period "strongly suggests that the common harm or 'suffering' by Independent Pharmacies due to discriminatory reimbursement by PBMs endures."  (*Id.* at 11.)

Finally, Dr. Seguin opines that, although he currently lacks the data to do so, he can feasibly empirically test for the presence of other anti-trust behavior identified by Dr. Cowan, namely, Cowan's hypotheses pertaining to (1) mail order pharmacies; (2) uninsured clients; and (3) the market for pharmacist services.  (*Id.* at 11.)  For the allegation that the PBMs' control of their own mail order pharmacy operations diverts high profit refill and maintenance prescriptions from retail pharmacies, Seguin opines that he can "test for the presence of this behavior." Specifically, he contends that "this hypothesis would be confirmed if I could demonstrate that IP's disproportionately filled prescriptions with a *Quantity* of one month or less, or, equivalently, whether 'multi-month' prescriptions were disproportionally filled by mail order pharmacies." (*Id.* at 12.)  For Cowan's hypothesis testing for discrimination in reimbursement for prescriptions filled for uninsured clients, Dr. Seguin opines that the "data fields would be identical to those provided in the most recent data run provided to us by defendants (especially Quantity and Reimbursement).  Upon receipt of the data, statistical analyses similar to those outlined above

would be performed.   Damages would again be easily calculated as the product of reimbursement discrimination and the number of prescriptions filled." (*Id.* at 13.)  For Cowan's hypothesis about the employment market for pharmacists, Dr. Seguin opines that Cowan has already demonstrated that, "although the supply of 'active' pharmacists increases over Cowan's sample period beginning circa 1970, the percent of said pharmacists that are self-employed has fallen by roughly 2/3rds from 9.4% in 1983 to but 3.4% in 1998.  Once commissioned, I will investigate whether this trend has continued." (*Id.*)

### 3.   Dr. Jerry A. Hausman

Caremark has submitted the May 15, 2015 Expert Report of Jerry A. Hausman ("2015 Hausman Report").  (ECF 261-10.)[12]  He has been asked by Caremark "to assess the plaintiffs' class certification claims, determine whether plaintiffs' claims can be proved or disproved with evidence common to the purported class, and to review Dr. Charles D. Cowan's proposed methods for using common evidence to prove or disprove each element of the plaintiffs' claims and Dr. Paul J. Seguin's purported application of some of these methods and his own report and analysis." (*Id.* at 2.)  Dr. Hausman has reached the following conclusions:

- Although Dr. Seguin claims to implement tests proposed by Dr. Cowan, differences between Dr. Seguin's implementation and Dr. Cowan's proposal mean that Dr. Seguin's tests are invalid even under Dr. Cowan's standard.
- Dr. Seguin fails to define a market, and thus cannot analyze the competitive

---

[12] Dr. Hausman is the MacDonald Professor of Economics at the Massachusetts Institute of Technology.  He graduated from Brown University in 1968 and received his doctorate in economics in 1973 from Oxford University.  (ECF 261-10 at 1.)  He received the John Bates Clark Award of the American Economic Association in 1985, which is awarded every other year for the most "significant contributions to economics" by an economist under the age of 40.  He was awarded the Frisch Medal of the Econometric Society in 1980.  He was named a Distinguished Fellow by the American Economic Association in 2013.  He has published over 170 academic research papers in leading economic journals, including the American Economic Review, Econometrica, and the Rand (Bell) Journal of Economics; he has also been an associate editor of Econometrica, the leading economics journal, and the Rand (Bell) Journal of Economics, the leading journal of applied microeconomics.  (*Id.* at 1-2.)

effects of the alleged conduct in a properly defined relevant market. Moreover, a standard econometric test rejects Dr. Seguin's claim that location is irrelevant. When corrected for this error, Dr. Seguin's model shows that independent pharmacies in the named plaintiffs' county often receive greater reimbursement than chain pharmacies.

- Dr. Seguin fails to demonstrate harm to competition in any relevant market. The test he has implemented fails to distinguish between lawful and unlawful behavior, and he provides no evidence that output has been restricted below competitive levels in any relevant market.

- Dr. Seguin fails to provide a basis for calculating damages. Because Dr. Seguin's damage calculations are based on a test that fails to distinguish between lawful and unlawful behavior, all of the damages Dr. Seguin calculates may be the result of factors other than the alleged unlawful behavior.

- Dr. Seguin incorrectly assumes common impact. A standard econometric test demonstrates that Dr. Seguin's assumption of common impact is incorrect. When this incorrect assumption is removed, Dr. Seguin's model shows that a substantial percentage of putative class members receive reimbursement that is greater than that received by many chains, and hence there is no antitrust impact that is common to members of the putative class.

- In fact, for Lipitor prescriptions in 2005 (the drug-year combination with the largest number of observations in Dr. Seguin's study), Dr. Seguin's model shows that 52.6% of independent pharmacies received <u>more than the reimbursement paid to the median chain pharmacy</u>.

- Dr. Seguin fails to demonstrate that the observed change in the number of independent pharmacy outlets is the result of the alleged discriminatory reimbursement as opposed to other factors. Even if Dr. Seguin had established such a connection, he fails to show that the observed change in the number of outlets demonstrates a harm to competition.

- Dr. Seguin's proposed future tests would not provide any evidence of anticompetitive behavior.

(*Id.* at 3-4 (emphasis in original).)

By way of background, Dr. Hausman opines that the work of PBMs "enables them to develop ways to increase efficiency for plan sponsors and patients, and to improve patient care by aiding in the management of prescription drug use by patients through interaction with patients and other health care providers regarding patient care. Thus, PBMs play an important role in promoting efficiency and effectiveness in the health care delivery system." (*Id.* at 5.) He adds that (1) PBMs compete against each other to obtain plan sponsor clients; (2) PBMs must

negotiate with plan sponsors, drug manufacturers, independent pharmacies, pharmacy chains, and businesses that negotiate on behalf of a collective of independent pharmacies; (3) during the period that Plaintiffs allege a conspiracy between PBMs was ongoing, the FTC's analysis of the Caremark/AdvancePCS merger concluded that "competition among PBMs will remain vigorous in the wake of the Caremark/AdvancePCS acquisition, and that this competition is likely to cause PBMs to pass on at least some of their cost savings to their customers in order to gain or retain their business" (*see* ECF 260-5, Statement of the Federal Trade Commission in the Matter of Caremark Rx, Inc./AdvancePCS, File No. 031 0239); (4) PBMs must meet the geographic needs of its clients; i.e., to gain the business of a plan sponsor with enrollees in a particular market, the PBM must include pharmacies in that market in its network; (5) pharmacies, including chains, must make a determination of the relative costs and benefits of participating in a particular network, including benefits from increased in-store business and non-pharmaceutical sales, and based on these considerations, some pharmacies, including some chains, do not participate in certain networks; (6) the contract between the PBM and the pharmacy governs the reimbursement rates for each particular network in which the pharmacy is a participant; (7) pricing in each network is different for brand name and generic drugs with the pharmacy typically reimbursed by the plan sponsor for the AWP less a negotiated discount percentage, plus a flat fee for dispensing; (8) pharmacies can be reimbursed for the dispensing of generic drugs either based on a similar formula, or based on what is called the maximum allowable cost ("MAC") rate list, which is a rate set by the PBM and which changes over time and plan.  (*Id.* at 5-7.)  Dr. Hausman notes that Dr. Seguin performed no analysis of reimbursement for generic drugs in his report.

Dr. Hausman states the following opinions regarding the class certification issues:

- Since the claims in this case relate to the retail pharmacy services that retail pharmacies sell to PBMs, and for which PBMs reimburse those pharmacies, the relevant product market consists of retail pharmacy services. He notes that this product market is the same as the relevant product market the Federal Trade Commission ("FTC") has used to analyze the effects of retail pharmacy mergers. (*Id.* at 7.)

- Neither Dr. Cowan nor Dr. Seguin define a relevant market in their reports, nor do they adequately explain their defined national market in their deposition testimony.

- The relevant product market for the purposes of this case is the market in which competition has allegedly been restrained, which is the retail pharmacy services market, in which pharmacies are the sellers of the services, and PBMs are the buyers of the services. (*Id.* at 7-8.)

- The geographic scope of the retail pharmacy services market is local.[13]  An important implication of the fact that pharmacy markets are local is that the bargaining power of a PBM with respect to pharmacies will vary depending on a number of factors unique to each market, including the number and type of pharmacies operating in the local market. Dr. Sequin's suggestion that geography does not matter is unsupported and inconsistent with the approach of the federal government in this area, as well as basic economics. When enrollees in a plan need a prescription, they need to have access to a pharmacy in their local area.  Hence when assembling a network, a PBM must meet the geographic needs of its clients.  (*Id.* at 8.)

- Using standard tools of antitrust analysis (as described in the Department of Justice and Federal Trade Commission Horizontal Merger Guidelines (2010)), Hausman concludes that geographic markets for retail pharmacies are local, not national, in scope, which is consistent with the FTC's analysis of retail pharmacy services product markets.  (*Id.* at 8-9.)

- There are factors unique to each local market, including the number and type of pharmacies operating in the local market.  In a market with many pharmacies, a PBM will have many options to choose from, and hence will be in a strong bargaining position. In contrast, in a market with few pharmacies, a PBM will have fewer options when assembling its network, and hence will be in a weaker bargaining position, all other factors being equal.  (*Id.* at 9-10.)

---

[13]  Both Dr. Cowan and Dr. Seguin have filed rebuttals to Dr. Hausman.  Regarding Hausman's assertion that he has failed to define a relevant market, Dr. Cowan opines "that it is clear from Dr. Hausman's own summary of the reach and scope of the PBMs that he believes that the market served by the PBMs in national."  (ECF 248, Ex. E (July 31, 2015 Rebuttal Expert Report of Charles D. Cowan, Ph.D. ("Cowan Rebuttal") at 3.)  He continues that Hausman's assertion that the geographic scope of retail pharmacy services is local is both misleading and incorrect.  Cowan notes that the class claims are about the national reach and impact of PBMs, and that he has personally shopped at chain pharmacies "in different states and paid exactly the same negotiated price for prescription medicines, regardless of where I am." (*Id.*)

- Dr. Seguin did not utilize all of the data he was provided.  For example, he did not take into account networks for which reimbursements were made, nor did he include an analysis of reimbursement for generic drugs.[14]  (*Id.* at 11.)
- Plaintiffs allege two antitrust conspiracies, one between Caremark and plan sponsors, and one between Caremark and two of its competing PBMs.  Dr. Seguin was not aware of the nature of the conspiracies alleged by the plaintiffs in this case.  Thus, he was unable to connect his findings to any particular claim.  (*Id.* at 11-12.)

Dr. Hausman also provides a critique of Dr. Seguin's specification for a regression model. While Seguin's model would find damages relating to Lipitor in 2005 of $300,103, Hausman asserts that Seguin's test differs from Dr. Cowan's proposal in several important respects.  The Cowan factors not accounted for by Dr. Seguin include any relationship between reimbursement and (1) the size of the chain, (2) network membership, (3) market concentration, (4) geographic and demographic factors, (5) membership in a bargaining collective, and (6) tradeoffs between brand drugs and generics in pricing.  As a result, Hausman asserts, the test Dr. Seguin actually performs is invalid under even Dr. Cowan's standard.[15]  (*Id.* at 13.)

---

[14]  In his rebuttal to Dr. Hausman, Dr. Seguin concedes that, "for demonstration purposes I examined only the reimbursement for brand-name (non-generic) prescription fulfillment.  One goal of my Report was to demonstrate feasibility, which I did successfully for the one market I examined.  Once class certification is granted, I can apply my methods to generics."  (ECF 248, Ex. D (July 31, 2015 Expert Rebuttal Report by Paul J. Seguin, PhD ("Seguin Rebuttal")) at 4.)

[15]  To address the criticism that he did not consider the size of the chain, Dr. Seguin responds that his "NPC" variable, which is the number of pharmacies in a chain, is used to isolate whether or not a chain contains five or fewer locations.  He opines that this adequately considers size.

To address the criticism that he did not consider pharmacy networks, Seguin has appended a new exhibit to his rebuttal in which he analyzed reimbursements for the 10 most commonly filled prescriptions as defined by Dr. Hausman, selecting the single most prescribed quantity, then, for each unique value of "network ID," calculated the average total reimbursement and the percent of those prescriptions filled under that network ID by IP.  (Seguin Rebuttal at 5.)  He opines that "[t]he (statistically significant) negative correlations show that as the percent of prescriptions under that network ID filled by independent pharmacies goes up, average compensation declines.  In other words, those network IDs associated with greater independent pharmacy participation are also associated with lower rates of reimbursement." (*Id.*)  He finds a 15.3% decline in the average reimbursement for filling a prescription of 30 pills

According to Dr. Hausman, both Dr. Cowan and Dr. Seguin fail to provide a market definition, the first step in assessing the competitive effects of an alleged antitrust violation analyzed under the rule of reason.  (*Id.* at 14.)  There is no discussion of either the product market or the geographic market allegedly monopolized.  He notes that Seguin testified at his deposition that he does not have "an expert or professional opinion on what is meant by geographic market," and that he has never attempted to define a boundary for a geographic market, or to identify the competitors within a geographic market.  (*Id.* at 14 (quoting ECF 261-5, March 19, 2015 Dep. of Paul J. Seguin, Ph.D. ("Seguin Dep.") at 126-27).)  Dr. Cowan, however, stated that geographic and demographic factors "must be included as variables in the set of equations to control for differences that may explain why there is variability in pricing." (*Id.* at 14 (quoting 2006 Cowan Report at 44).)  Nonetheless, Dr. Seguin claimed that his model "has shown that geography is not a factor," and therefore pharmacies compete "regardless of [their] geographic location."  (Seguin Dep. at 123-24.)  Hausman opines that this "position is wrong as a matter of common sense, is contrary to the FTC's assessment, and is rejected as a matter of econometrics."  (2015 Hausman Report at 14).

---

under an IP contract as compared to a chain contract.  (*Id.* at 6.)  Dr. Seguin's use of averages is addressed *infra*.

To address the criticism that he did not consider market concentration, Seguin contends that his NPZ variable, which is the number of pharmacies in a zip code, is used to account for market concentration.  While he did not specifically discuss his reasons for using zip codes in his first report, he asserts that using it to define geographic areas is accepted and is used by Dr. Hausman himself.  (*Id.* at 7-8.)  He also contends that using zip codes addresses Hausman's criticism concerning the lack of geographic factors.  (*Id.* at 10.)  He adds that he has also incorporated median income of each zip code, thereby accounting for demographic factors.  (*Id.*) He concedes that he has not considered "membership in a bargaining collective," but notes that this data was not provided by either side.  (*Id.*)  He explains the lack of consideration of the "tradeoff between brand name and generic drugs" by noting that "the decision to fill 'as written' is generally up to the prescribing physician, an individual that is not a party to this case and not subject to any influence by the PBM."  (*Id.*)

To rebut Dr. Seguin's assertion that geography is not a factor, Dr. Hausman attempts to test "whether the coefficients for pharmacies in one geographic area are different than the coefficients for pharmacies in another geographic area."  (*Id.* at 15.)  Hausman tests "whether the coefficients for pharmacies in Jackson County, Alabama (the location of the named plaintiffs) are different from the coefficients for pharmacies in the rest of the country.  I perform the test for the top 5 most-dispensed drugs in Jackson County for both 2005 and 2008."  (*Id.*) Hausman sought to obtain for each "the probability of obtaining the observed difference between the Jackson County coefficients and the coefficients for the rest of the country under the hypothesis that Dr. Seguin's assumption is correct."  (*Id.* at 16.)  He finds that the test rejects Dr. Seguin's assumption for 9 of the 10 drug- year combinations and thus concludes that "Dr. Seguin's assumption that 'location is irrelevant' is incorrect."  (*Id.*, Table 1 (finding p values of 0.000 for 7 drug-year combinations, 0.004 for one drug-year combination, 0.019 for one drug-year combination, and 0.350 for one drug-year combination (Toprol XL).)  Hausman reports that, while Dr. Seguin's assumption would calculate $4,273.01 in aggregate damages to Jackson County IPs for those ten drug-year combinations based on his national coefficient, a similar calculation using a Jackson County coefficient results in negative damages of -$1,489.87.  (*Id.* at 16-17.)  This would indicate that those IPs are estimated to have received higher reimbursements than chain pharmacies.[16]  (*Id.* at 17.)

---

[16]  Dr. Seguin responds that Dr. Hausman has misinterpreted his testimony that "geography is not a factor," noting that he has estimated a model where geography is made a variable through first excluding and then including the NPZ term.  (Seguin Rebuttal at 12-13.) He found that allowing for zip-code specific variation did not alter his conclusions concerning reimbursement discrimination; thus "geography was not a factor, as significant discrimination was found using either method."  (*Id.* at 13.)  Seguin suggests that Hausman's test is flawed because the sample size and the required parameters are limited to the small number of prescriptions filled within Jackson County.  (*Id.* at 13-14.)  He adds that, should the class be

Next, Dr. Hausman criticizes Dr. Seguin's failure to demonstrate harm to competition in any relevant market.  He opines that, although Dr. Seguin "claims that he was able to 'empirically test for the presence of anti-competitive behavior,' Dr. Seguin's results do not demonstrate that competition has been harmed."  (*Id.* at 17-18 (footnote omitted).)  While Seguin stated that his hypothesis is that "a condition of a legal world would be that . . . chains and independent pharmacies would be reimbursed at the same levels," (*see* Seguin Dep. at 200), Hausman opines that "observing a reimbursement differential does not prove illegal behavior, because (as Dr. Cowan has acknowledged) large pharmacies receive better reimbursement than smaller pharmacies because they are in a better bargaining position.  Indeed, because Dr. Seguin's test fails to account for the reimbursement-size relationship acknowledged by Dr. Cowan, Dr. Seguin's test would find anticompetitive behavior even when no such behavior has occurred."  (2015 Hausman Report at 18 (parenthesis in original).)  Hausman asserts that one must

> distinguish between monopsony power (in which a large buyer reduces the price it pays by restricting the quantity of purchases) and bargaining power (in which a large buyer uses its bargaining power to reduce the price it pays without restricting the quantity of purchases), and that the PBM business is not conducive to the exercise of monopsony power.  Thus, if the differential reflects the exercise of bargaining power, then there is no harm to competition and, if anything, consumers are likely to benefit as the PBMs pass the lower prices along to their customers.

(*Id.* at 19 (citing ECF 260-5 (FTC Statement on *In re Caremark*) in which the FTC found that the exercise of monopsony power was unlikely); ECF260-1 (FTC Statement on Express Scripts Acquisition of Medco Health Solutions) in which the FTC again found the exercise of

---

certified, he could alter and increase the breadth of his variables to account for local variations.  (*Id.* at 14.)

monopsony power unlikely in the PBM industry).)[17]   Hausman notes that Seguin acknowledged that he did not know the explanation for the average reimbursement differential he observed, he offered no opinion about what caused the differential, and he could not rule out other factors as being responsible for the differential because he did not consider any other factors.  (*Id.* at 19 (citing Seguin Dep. at 71-72, 75-76).)   Because Dr. Seguin's test does not distinguish between unlawful and lawful explanations for the differential, Hausman asserts that Seguin cannot claim that the differential is evidence of unlawful behavior.  (*Id.*)   Additionally, Hausman faults Seguin's analysis since he provides no evidence that market output has been restricted.  (*Id.* at 19-20.)

Next, Dr. Hausman offers a critique of Dr. Seguin's attempt to construct a but-for world to provide common evidence of damages.  He notes that Seguin made no assumptions about what a but-for world would look like, and he professed to have no understanding of the

---

[17]   Dr. Cowan takes issue with Dr. Hausman's assertion that Dr. Seguin has not demonstrated harm to competition.  According to Cowan, Hausman is "only looking at one piece of Dr. Seguin's analysis and not considering the whole of his analysis where Dr. Seguin demonstrates that the impact of the PBMs is to reduce the number of independent pharmacies including small chains relative to the total number of pharmacies nationally - clearly a harm to competition." (Cowan Rebuttal at 6.)  However, Dr. Cowan does not explain how the reduction in the IPs' market share constitutes harm to competition, rather than harm to certain competitors — an important distinction since the anti-trust laws have been enacted for the protection and preservation of competition, not for the protection of competitors.  *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977) (citing *Brown Shoe*, 370 U.S. at 320). Regarding Hausman's discussion of monopsony power, Cowan responds that "if the small Independent doesn't agree to a severely reduced reimbursement, the PBM simply doesn't agree to work with them, thus restricting the quantity of purchases." (*Id.*)  Regarding the concept of distinguishing monopsony power from bargaining power, Cowan opines that Hausman "is assuming away the problem instead of considering that this is essentially a legal question about impacts and the loss of competition because of interference in the market." (*Id.* at 7.)  He takes issue with Hausman's "very narrow definition" asserting that, if by market output one can interpret the reduction in the number of small chains and the consolidation of the market into a few very large players because of the actions of the PBMs, then Dr. Hausman himself is arguing that there is a competitive harm.  (*Id.*)

conspiracies alleged in the SAC.[18]   Seguin also conceded that he did not consider factors other

than an alleged conspiracy that might have contributed to the differential in average

reimbursements between IPs and larger chains and could not offer an opinion on "how much" of

the $23 million differential he found was caused by an antitrust conspiracy or some other

cause.[19]   When asked if he could "rule out to a reasonable degree of certainty in the field of

economics and statistics that the entire $23 million differential was caused by something other

than a violation of the antitrust laws," Dr. Seguin testified, "My report shows a differential and to

the extent that I do not attribute that differential to any one factor, I have no opinion on the cause

of that differential. . . .   I didn't consider other factors."   (Seguin Dep. at 76.)   From this

testimony, Dr. Hausman opines that

> Dr. Seguin's damage calculation is invalid because it is not limited to the effects
> of the alleged illegal behavior.  As I explained above, Dr. Seguin's test (which is
> the basis for his damage calculation) finds independent pharmacies to be
> undercompensated even if no such undercompensation exists.   Dr. Seguin
> acknowledged at his deposition that he is not suggesting that the differential is the
> result of a conspiracy alleged in the Complaint.  Dr. Seguin's calculation does not
> separate lawful reasons for the differential from unlawful reasons.  Indeed, Dr.
> Seguin acknowledged that because he did not consider other factors that could
> explain the differential (such as the relative bargaining power of small pharmacies
> vs. large pharmacies), he cannot rule out that the entire $23 million differential he
> finds was caused by something other than a violation of the antitrust laws.
> Furthermore, Dr. Seguin has no opinion as to whether the differential reflects
> independent pharmacies being paid too little or larger chains being paid too much.
> If the differential reflects chains being paid "too much," then independent
> pharmacies are not underpaid and there are no damages. Therefore, his statement
> in his report that he has "reliably demonstrate[d] that . . . reimbursement rates are
> too low" is not supported and inconsistent with his deposition testimony.

---

[18] Dr. Seguin testified:  "Q.  Was it important in any way for your work to understand the
nature of the conspiracy alleged in the Complaint?  A.  Only to the extent of defining the class
(i.e., as IPs with five or fewer locations). . . .  Q.  In your work on this case, did you make any
assumptions about what a but-for world would look like?  A. No."  (Seguin Dep. at 73-74.)

[19] Dr. Seguin stated:  "Q.  So that you're stating that for these two years combined the
differential when you add it all up is roughly $23 million, correct?  A. Correct.  Q.  And you're
not saying of that $23 million how much may have been caused by a conspiracy and how much
may have been caused by something else; is that correct?  A.  Correct."  (Seguin Dep. at 75.)

(2015 Hausman Report at 21-22 (footnotes citing Seguin Dep. omitted).)[20]

According to Dr. Hausman, Dr. Seguin has only demonstrated that IPs are on average reimbursed less than chain pharmacies, but he has not shown that all or nearly all IPs are reimbursed less than chain pharmacies.  Hausman opines, therefore, that Seguin has failed to provide evidence common to the class of antitrust impact.  (*Id.* at 22-23.)  Seguin assumed that only two factors affect the reimbursement a pharmacy receives:  the quantity of the drug dispensed and whether the pharmacy is an independent or chain.  According to Hausman, Seguin's estimated coefficient on the independent-pharmacy variable reflected the average reimbursement differential between independents and chains, holding quantity constant, and demonstrated that nearly all IPs were reimbursed less than chain pharmacies.  Hausman attempts to test this assumption using an F test comparing a restricted model to an unrestricted model.  Hausman's "restricted" model is Dr. Seguin's model, which assumes that there are no pharmacy-specific factors (other than being an independent or a chain) that affect reimbursement.  The "unrestricted" model is a model that allows pharmacy-specific effects by adding what Hausman calls a "fixed effect" for each pharmacy.  (*Id.* at 23.)

Hausman performed the F test for the top 5 drugs in 2005 and the top 5 drugs in 2008. The p value he calculated for these drug-year combinations "is approximately zero.  Thus, the F test strongly rejects Dr. Seguin's assumption in favor of a model that allows for pharmacy-specific effects."  (*Id.* at 24; Table 2.)  Hausman opines that this result "means that there is significant variation in reimbursement across pharmacies that is not captured by Dr. Seguin's

---

[20] Dr. Seguin responds that Dr. Hausman's assertion — that the differential Seguin finds between chain and IP reimbursements may be due to lawful behavior including the relative bargaining power of small versus large pharmacies — is speculation.  (Seguin Rebuttal at 20.) He reiterates that his model estimates the difference between the compensation to a chain pharmacy for filling a particular drug versus the compensation for the identical service performed by an IP.  (*Id.*)

model and that Dr. Seguin's model cannot be relied upon to demonstrate common impact." (*Id.*) Focusing on one drug-year combination, Lipitor in 2005, Hausman asserts that the data show that that "almost all (99.78%) independents receive reimbursement that is greater than the reimbursement received by the lowest-reimbursed chain. Over half (52.60%) of independents receive reimbursement that is greater than the median chain. Some independents (1.68%) even receive reimbursement that is higher than the highest-reimbursed chain." (*Id.* at 25; Table 3.) According to Dr. Hausman, "[t]hese results demonstrate that when Dr. Seguin's incorrect assumption is removed, his own model shows that a substantial percentage of putative class members receive reimbursement that is greater than that received by many chains, and hence there is no antitrust impact that is common to members of the putative class."[21] [22] (*Id.* at 26.)

---

[21] Dr. Seguin responds that Dr. Hausman "does not argue with the $300,103 differential, he merely wonders how this differential should be allocated among class members." (Seguin Rebuttal at 15.) He asserts that the F test examines whether Hausman's more complicated analysis "offers a better fit than my parsimonious model which requires estimating only three parameters," and finds that allowing the variable "to vary across pharmacy names offers a better fit." (*Id.*) Seguin contends that this finding is specious because: (1) while Hausman argues that markets are local, his specification implies that all locations receive the same reimbursement regardless of their locale; (2) a substantial percent of the pharmacies Hausman selected filled a prescription for a selected drug only once during the year; thus sufficient data (which Seguin defines as at least 30 observations) exist for estimating pharmacy-specific reimbursement differentials for only 20%-36% of the pharmacies; (3) Hausman's F test does not directly compare his model to Seguin's because Hausman's model does not include information on whether the particular pharmacy is a chain or an IP; virtually all of the pharmacy to pharmacy dispersion Hausman documents is explained by whether that pharmacy was an IP or a chain; and (4) Hausman's specification provides no insight to the trier of facts concerning the key issue of whether IP's receive a lower reimbursement than do chains. (*Id.* at 16-20.)

[22] Dr. Cowan responds to Dr. Hausman's criticism involving Dr. Seguin's use of averages that fails to show pharmacy level variation contending that Seguin's analysis "doesn't preclude pharmacy level variation – he's measuring an average, as Dr. Hausman states. In the real world, one would expect there to be pharmacy level variation, but that doesn't mean that there is not an overall impact on the Independents. . . . [I]t is misleading to argue that there is significant variation in pharmacy by pharmacy reimbursement without considering that one major component of that variation is the average reduction observed for Independents." (Cowan Rebuttal at 8.)

Next, Dr. Hausman offers a critique of Dr. Seguin's analysis of the number of pharmacy outlets. While Seguin opines that the differential between the growth of IPs and non-IPs "strongly suggests that the common harm or 'suffering' by Independent Pharmacies due to discriminatory reimbursement by PBMs endures," (*see* 2014 Seguin Report at 10), Hausman opines that Seguin "fails to demonstrate that the observed change in the number of outlets is the result of the alleged 'discriminatory reimbursement,'" or that "the observed change in the number of outlets demonstrates a harm to competition." (2015 Hausman Report at 26-27.) He notes that Seguin conceded at his deposition (1) that "there are numerous potential explanations" why the relative number of outlets of a chain group rose more rapidly than that of IPs, and (2) that he did not test any of those explanations. (Seguin Dep. at 211.) He further conceded that reimbursement differential "is one but not necessarily the only force" causing the reduction in IP market share. (*Id.* at 205-06.) Dr. Hausman faults Dr. Seguin for "simply assum[ing] causation and fail[ing] to demonstrate that the observed change in the number of [IP] outlets is the result of 'discriminatory reimbursement.'" (2015 Hausman Report at 27.) He also faults Seguin's analysis for failing to demonstrate that the observed change demonstrates a harm to competition since IPs are part of a broader market of chains and mass-merchandizers for which the data show an increase in the number of outlets and the number of prescriptions dispensed. (*Id.* at 28.)

Finally, Dr. Hausman opines that the tests Dr. Seguin proposes to test for the presence of antitrust behavior are invalid. While Seguin proposes to test whether multi-month prescriptions are disproportionately filled by mail-order pharmacies, Hausman opines this is invalid because it would provide no evidence on whether there was an output reduction in a properly defined relevant market, and hence Dr. Seguin's test fails to test for anticompetitive behavior. (*Id.* at 29.)

According to Hausman, Seguin's proposal to test for discrimination in reimbursement for prescriptions filled for uninsured clients is also invalid because,

> prices paid by uninsured customers cannot be used as a benchmark for the reimbursement paid by PBMs. The reimbursement rates paid by PBMs are set by negotiations between PBMs and pharmacy chains and, as discussed above, larger chains should be expected to receive greater reimbursement due to their greater bargaining power. In contrast, the prices paid by uninsured customers are not determined through a negotiation that depends on chain size, but instead are set by the pharmacies. Thus, if Dr. Seguin found that there was no reimbursement differential for uninsured customers, such a finding would not indicate the absence of a PBM conspiracy, but instead an expected competitive outcome.

(*Id.* at 30.) Hausman also opines that Seguin's proposal to examine whether the percentage of self-employed pharmacists has continued to decrease would also provide no evidence of anticompetitive behavior, because it would provide no evidence of reduced output in a properly defined relevant market. (*Id.*)

### III.    The *Daubert* Motion

The United States Court of Appeals for the Third Circuit has joined "certain of our sister courts to hold that a plaintiff cannot rely on challenged expert testimony, when critical to class certification, to demonstrate conformity with [Federal Rule of Civil Procedure] 23 unless the plaintiff also demonstrates, and the trial court finds, that the expert testimony satisfies the standard set out in *Daubert [v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993)]." *In re Blood Reagents Antitrust Litig.*, 783 F.3d 183, 187 (3d Cir. 2015). The Court held that expert testimony "that is insufficiently reliable to satisfy the *Daubert* standard cannot 'prove' that the Rule 23(a) prerequisites have been met 'in fact,' nor can it establish 'through evidentiary proof' that Rule 23(b) is satisfied." *Id.*

The *Daubert* analysis governing the admissibility of expert testimony has been codified in Federal Rule of Evidence 702, which provides as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:  (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  The proponent of the expert testimony has the burden of establishing its admissibility by a preponderance of the evidence.  *Padillas v. Stork-Gamco, Inc.*, 186 F.3d 412, 418 (3d Cir. 1999) (citing *Daubert*, 509 U.S. at 592 n.10 (1993)); *see also Mahmood v. Narciso*, 549 F. App'x 99, 102 (3d Cir. 2013) (citing *In re TMI Litig.*, 193 F.3d 613, 663 (3d Cir. 1999)).

There are three requirements for the admissibility of expert testimony pursuant to Rule 702, "'qualification, reliability and fit.'"  *Calhoun v. Yamaha Motor Corp., U.S.A.*, 350 F.3d 316, 321 (3d Cir. 2003) (quoting *Schneider v. Fried*, 320 F.3d 396, 405 (3d Cir. 2003)).  "Qualification requires 'that the witness possess specialized expertise.'"  *Id.* (quoting *Schneider*, 320 F.3d at 405).  The Third Circuit has "'interpreted this requirement liberally,' holding that 'a broad range of knowledge, skills, and training qualify an expert as such.'"  *Id.* (quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741 (3d Cir.1994) ("*Paoli II*" ).

The "reliability" prong requires that "the expert's opinion must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'; the expert must have 'good grounds' for his or her belief."  *Id.* (quoting *Paoli II* at 742 (quoting *Daubert*, 509 U.S. at 590)).  An assessment of "'the reliability of scientific evidence under Rule 702 requires a determination as to its scientific validity.'"  *Id.* (quoting *Paoli II* at 742).  The reliability prong "applies to all aspects of an expert's testimony:  the methodology, the facts underlying the expert's opinion, and the link between the facts and the conclusion."  *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 291 (3d Cir. 2012) (quotations omitted).  Where the expert's

"factual basis, data, principles, methods, or their application are called sufficiently into question, . . . the trial judge must determine whether the testimony has 'a reliable basis in the knowledge and experience of the relevant discipline.'"  *Id.* at 294 (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999)).

"Fit" means that "'the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact.'"  *Calhoun*, 350 F.3d at 321 (quoting *Schneider*, 320 F.3d at 405).  It pertains "'primarily to relevance.'"  *Meadows v. Anchor Longwall & Rebuild, Inc.*, 306 F. App'x 781, 790 (3d Cir. 2009) (quoting *Lauria v. Nat'l R.R. Passenger Corp.*, 145 F.3d 593, 599 (3d Cir. 1998)).  "The expert's testimony must 'fit' under the facts of the case so that 'it will aid the [fact finder] in resolving a factual dispute.'"  *Id.* (quoting *Lauria*, 145 F.3d at 599).  This element "'requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility.'"  *Id.* (quoting *Lauria*, 145 F.3d at 600).  "In other words, expert testimony based on assumptions lacking factual foundation in the record is properly excluded."  *Id.* (citing *Stecyk v. Bell Helicopter Textron, Inc.*, 295 F.3d 408, 414 (3d Cir. 2002)).

Caremark raises several reliability and fit arguments:  (1) Plaintiffs' expert evidence fails to distinguish between legal conduct and illegal conduct, rendering it unfit; (2) the experts offer no reliable opinion about the existence of an antitrust violation; (3) the expert evidence does not track Plaintiffs' different theories of liability, rendering it unreliable under the United States Supreme Court's decision in *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013); (4) the use of national averages in the expert model cannot demonstrate antitrust impact for individual class members, rendering it unfit; and (5) the regression model is unreliable because it finds damages for class members who have suffered no damage.

Plaintiffs' expert evidence fails to pass *Daubert* analysis.  Dr. Seguin's regression model, while asserting that there is a difference in reimbursement rates paid to IPs and chain pharmacies at the national level, does not attribute that differential solely to illegal conduct alleged in the SAC.  As Dr. Hausman notes, Dr. Seguin's underlying hypothesis that "a condition of a legal world would be that . . . chains and independent pharmacies would be reimbursed at the same levels," (*see* Seguin Dep. at 200), fails to account for legal behavior that could result in different reimbursement rates, such as local market concentration, size efficiencies, and differences in bargaining power.  Dr. Cowan has acknowledged that large pharmacies can receive better reimbursement rates than smaller pharmacies for the completely legal reason that they are in a better bargaining position.  Dr. Seguin's test fails to account for the reimbursement/size relationship acknowledged by Dr. Cowan, and Seguin's test could find antitrust impact where no anticompetitive behavior has occurred.  (*See* 2015 Hausman Report at 18-19 (faulting Seguin's failure to distinguishing monopsony power from bargaining power); ECF 260-5 (FTC Statement on *In re Caremark*) (finding that the exercise of monopsony power in the PBM industry was unlikely); ECF260-1 (FTC Statement on Express Scripts Acquisition of Medco Health Solutions) (same).)[23]  Importantly, Seguin offered no antitrust explanation for the average reimbursement

---

[23]  Cowan's response to Hausman's discussion of monopsony power is unavailing.  Cowan asserts that "if the small Independent doesn't agree to a severely reduced reimbursement, the PBM simply doesn't agree to work with them, thus restricting the quantity of purchases." (Cowan Rebuttal at 6.)  There appears to be no evidence in the record to support this assertion.  Regarding the concept of distinguishing monopsony power from bargaining power, Cowan opines that Hausman "is assuming away the problem instead of considering that this is essentially a legal question about impacts and the loss of competition because of interference in the market." (*Id.* at 7.)  However, it is Plaintiffs' class certification burden to show impact and loss of competition because of market interference through common evidence.  The assertion that there has been a "reduction in the number of small chains and the consolidation of the market into a few very large players," does not itself demonstrate illegal behavior since consolidation may be the result of market forces, a factor that the Plaintiffs fail to exclude as a possible reason for the impact they allege.

differential he observed and admitted that he could not rule out other factors as being responsible for the differential because he did not consider any other factors. (*See* Seguin Dep. at 71-72, 75-76.)  Because Dr. Seguin's test does not distinguish between unlawful and lawful explanations for the observed differential, it does not constitute evidence of unlawful behavior and fails to fit test. *Accord Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic*, 152 F.3d 588, 593 (7th Cir. 1998) (stating that statistical studies that "fail to correct for salient factors, not attributable to the defendant's misconduct, that may have caused the harm of which the plaintiff is complaining do not provide a rational basis for a judgment" and are "worthless").

Plaintiffs' experts offer no reliable opinion about the existence of an antitrust violation for the plan sponsor conspiracy claim.  There are four essential elements of an antitrust claim under § 1 of the Sherman Act analyzed under the rule of reason:  (1) concerted action by the defendants; (2) that produced anti-competitive effects within the relevant product and geographic markets; (3) that the concerted action was illegal; and (4) that the plaintiff was injured as a proximate result of the concerted action.  *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 442 (3d Cir. 1997).  "The relevant geographic market 'is that area in which a potential buyer may rationally look for the goods or services he seeks.'"  *Fed. Trade Comm'n v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 338 (3d Cir. 2016) (quoting *Gordon v. Lewistown Hosp.*, 423 F.3d 184, 212 (3d Cir. 2005); *U.S. Horticultural Supply v. Scotts Co.*, 367 F. App'x 305, 311 (3d Cir. 2010).  A market's geographic scope is "[d]etermined within the specific context of each case," and "must 'correspond to the commercial realities of the industry' being considered and 'be economically significant.'"  *Id.* (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 336-37 (1962) (footnote and internal quotation marks omitted in original).  Plaintiffs bear the burden of establishing the relevant geographic market.  *Id.* (citing *St. Alphonsus Med. Ctr. –*

*Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 784 (9th Cir. 2015).   Because establishing the geographic market looks to buyer behavior, "the evidence of the geographic market presented by the party claiming a Section 1 violation must therefore speak to buyer behavior." *U.S. Horticultural Supply*, 367 F. App'x at 311.

Neither Dr. Cowan nor Dr. Seguin have provided a market definition or attempted to relate their conclusions to anti-competitive effects in either a product market or a geographic market.   Indeed, Seguin testified that he does not have "an expert or professional opinion on what is meant by geographic market," he has never attempted to define a boundary for a geographic market, and has never attempted to identify the competitors within a geographic market.[24]   (Seguin Dep. at 126-27.)   The failure to offer an opinion on the geographic market renders the conclusion on antitrust impact unreliable.   Dr. Hausman opines that the relevant market is the retail pharmacy services market — in which pharmacies are the sellers of the services and PBMs are the buyers of the services — and that the geographic scope of that product market is local.   While Dr. Sequin suggests that the geographic market is national because including a location variable in his regression did not change the result, this finding is inconsistent with the approach taken by the FTC in conducting antitrust analyses of past PBM mergers.   (*See* Hausman Report at 7 n.9 (citing FTC statements in PBM mergers defining market to be retail pharmacy services); 9 n. 13 (citing FTC statements defining local geographic markets).)   Dr. Hausman aptly opines that, when enrollees in a plan need a prescription, they

---

[24] It must also be noted that although the SAC asserts that Caremark acted as a "conduit for the Client Payors to engage in horizontal restraint of trade by removing the need and existence for any market whereby they must compete in order to secure the services of pharmacists to service their insured," (SAC ¶ 5d), Plaintiffs offered no expert economic analysis of this claim to support a rule of reason analysis.   Their assertion that this activity gave Caremark and the other PBMs market power in the negotiation of these services to engage in horizontal price fixing (see ECF 181 at 4-5; SAC ¶ 5) is also unsupported by expert market analysis.

need to have access to a pharmacy in their local area; hence, when assembling a network, a PBM must meet the geographic needs of its clients.  (Id. at 8.)  This approach is consistent with the FTC's analysis of retail pharmacy services product markets, and it appears beyond reproach that factors unique to each local market, including the number and type of pharmacies operating in the local market and their resultant bargaining power, must be considered in a discussion of antitrust impact.  Dr. Cowan and Dr. Seguin fail to analyze this consideration.

Plaintiffs' expert evidence also does not track their different theories of liability, rendering it unreliable under the United States Supreme Court's decision in *Comcast*.  In that case, the Court considered the class certification of a class of more than two million current and former Comcast subscribers who sought damages for purported antitrust violations.  133 S. Ct. at 1429-30.  Both the district court and the Third Circuit had determined that the putative class satisfied Rule 23(b)(3)'s predominance requirement, with the Court of Appeals holding that "[a]t the class certification stage," the proposed class did not have to "tie each theory of antitrust impact to an exact calculation of damages."  *Id.* at 1431 (quoting *Behrend v. Comcast Corp.*, 655 F.3d 182, 206 (3d Cir. 2011) (quotations omitted)).  The Supreme Court reversed, holding that Rule 23(b)(3) had not been satisfied because the plaintiffs' model of damages fell "far short of establishing that damages are capable of measurement on a classwide basis."  *Id.* at 1433.  The majority emphasized that while damages calculations "need not be exact" at the class-certification stage, "any model supporting a 'plaintiff's damages case must be consistent with its liability case, particularly with respect to the alleged anticompetitive effect of the violation.'"  *Id.* (citations omitted).

The plaintiffs in *Comcast* had alleged four theories of antitrust impact, but the district court accepted only one such theory as "capable of classwide proof and rejected the rest."  *Id.* at

41

1431.  The damages model proposed by plaintiffs, however, failed to "isolate damages resulting from any one theory of antitrust impact." *Id.*  The Supreme Court held that this inability to match a damages model with any one theory of liability was fatal to class certification, noting that under the Third Circuit's logic, "any method of measurement" would conceivably be "acceptable so long as it [could] be applied classwide, no matter how arbitrary the measurements." *Id.* at 1433.  The majority held that the *Comcast* class was improperly certified "[i]n light of the [damages] model's inability to bridge the differences between supra-competitive prices in general and supra-competitive prices attributable to the [one antitrust impact theory found to be viable]." *Id.* at 1435.

Plaintiffs' expert submissions here are similarly defective.  First, they assign any differential found to be the result of Defendants' alleged conduct.  Second, while the SAC asserts two distinct antitrust conspiracies — a conspiracy among PBMs and a conspiracy between PBMs, plan sponsors, and chain pharmacies — Dr. Cowan and Dr. Seguin fail to propose a model capable of distinguishing the damages that are attributable to each of the two theories of liability.  The teaching of *Comcast* is that antitrust plaintiffs must match a damages model to their theory of liability.  The failure to do so here may well lead to the same paradox condemned in *Comcast*, i.e., a damages model unattributed to any specific theory of antitrust impact being accepted at class certification with the possibility of one or more of those theories ultimately rejected under Rule 56 or at trial.

In the context of *Daubert*, the failure to match the damages model to the theory of antitrust impact renders the expert opinion unfit since it cannot assist the Court at this point in the litigation in applying the Rule 23 requirements or assist the trier of fact later on to determine damages attributable to the purported antitrust violation.  Indeed, Dr. Seguin testified that he did

not seek to understand the nature of the conspiracies alleged by the Plaintiffs — other than "understanding this is an antitrust case" — and did not attempt to connect his findings to any particular claim or attempt to attribute what portion of damages he measured to the two theories. (ECF 261-7 at 72:23-73:11; ECF 261-9 at 132:6-15.)

Another insurmountable *Daubert* fit problem arises from the use of national averages in the expert model since averages cannot demonstrate antitrust impact for individual class members. Because antitrust impact is an element of Plaintiffs' causes of action,[25] "every class member must prove at least some antitrust impact resulting from the alleged violation." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 311 (3d Cir. 2008). Dr. Seguin has only demonstrated that IPs are **on national average** reimbursed less than chain pharmacies, but he has not shown that all or nearly all IPs are reimbursed less than chain pharmacies. This creates two *Hydrogen Peroxide* issues: national averages do not account for legitimate, locally

---

[25] Even when pursuing a per se violation of the antitrust laws plaintiffs must establish that they suffered an antitrust impact. *See Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 341-42 (1990) ("We also reject respondent's suggestion that no antitrust injury need be shown where a per se violation is involved."); *In re Mercedes-Benz Antitrust Litig.*, 213 F.R.D. 180, 188 (D.N.J. 2003) (same). As the Court stated,

> The antitrust injury requirement ensures that a plaintiff can recover only if the loss stems from a competition-reducing aspect or effect of the defendant's behavior. The need for this showing is at least as great under the per se rule as under the rule of reason. Indeed, insofar as the per se rule permits the prohibition of efficient practices in the name of simplicity, the need for the antitrust injury requirement is underscored. "[P]rocompetitive or efficiency-enhancing aspects of practices that nominally violate the antitrust laws may cause serious harm to individuals, but this kind of harm is the essence of competition and should play no role in the definition of antitrust damages." Page, The Scope of Liability for Antitrust Violations, 37 Stan.L.Rev. 1445, 1460 (1985). Thus, "proof of a per se violation and of antitrust injury are distinct matters that must be shown independently." P. Areeda & H. Hovenkamp, Antitrust Law ¶ 334.2c, p. 330 (1989 Supp.).

*Atl. Richfield Co.*, 495 U.S. at 344.

explained factors creating differentials in reimbursements between IPs and chains (like market concentration and bargaining power), and averages cannot account for substantial deviations between the IPs themselves.[26]

Numerous courts have rejected the use of average price differentials to show evidence of antitrust impact that is common to the class. *See e.g.*, *Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*, Civ. A. No. 04-5898, 2010 WL 385552, at *30 (E.D. Pa. Sept. 30, 2010) (noting that methodology using average prices was insufficient as a common method capable of showing class-wide injury because "averaging by definition glides over what may be important differences") (quotations omitted) (citing ABA Section of Antitrust Law, Econometrics: Legal, Practical, and Technical Issues 220 (2005) ("Using averages can lead to serious analytical problems.  For example, averages can hide substantial variation across individual cases, which may be key to determining whether there is common impact."); *Gates v. Rohm & Haas Co.*, 655 F.3d 255, 266 (3d Cir. 2011) (averages evidence "is not 'common' because it is not shared by all (possibly even most) individuals in the class. Averages or community-wide estimations would not be probative of any individual's claim because any one class member may have an exposure level well above or below the average" and noting that "[a]ttempts to meet the burden of proof using modeling and assumptions that do not reflect the individual characteristics of class members have been met with skepticism.") (citations omitted); *In re Optical Disk Drive Antitrust Litig.*, 303 F.R.D. 311, 321 (N.D. Cal. 2014) (statistical model

---

[26]   Plaintiffs argue that the additional factors that Caremark raises "simply represent an alternative view of the question and in no way show that Dr. Seguin's approach to local variation to be incapable of proving impact and damages on a class-wide basis."  (ECF 269 at 25.)  They argue that the "failure to include all the proper variables" goes to an expert report's "'probativeness, not its admissibility.'"  (*Id.* (quoting *In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 256 F.R.D. 82, 98, 100-102 (D. Conn. 2009).)  This pre-*Blood Reagents* authority is unhelpful.  Courts must now ensure that expert evidence is admissible for *Daubert* purposes before a party may use it to meet their class certification burden.

in which the alleged conspiratorial overcharge was assumed to be the same for all purchasers and throughout the entire class period "cannot serve to establish that all (or nearly all) members of the class suffered damage as a result of defendants' alleged anti-competitive conduct [because the] regression analysis . . . assumes the very proposition that the [Plaintiffs] are now offering it, in part, to show."); *Reed v. Advocate Health Care*, 268 F.R.D. 573, 591 (N.D. Ill. 2009) ("Measuring average base wage suppression does not indicate whether each putative class member suffered harm from the alleged conspiracy.  In other words, it is not a methodology common to the class that can determine impact with respect to each class member."); *In re Flash Memory Antitrust Litig.*, Civ. A. No. 07-0086, 2010 WL 2332081, at *10 (N.D. Cal. June 9, 2010) ("By looking only at an average price trend, [plaintiff's expert's] model obscures individual variations over time among the prices that different customers pay for the same or different products that appear in the data.")

As the Hon. Lawrence F. Stengel noted in *Sheet Metal Workers*, [j]ust because an average price was increased or decreased by the alleged [anticompetitive activity] does not mean that all members of the proposed class paid supra-competitive prices or that any damage for an individual end-payor could be calculated in a formulaic way by common proof."  *Id.*, 2010 WL 385552, at *30.  *But see, In re Processed Egg Prod. Antitrust Litig.*, 312 F.R.D. 171, 199 (E.D. Pa. 2015) (stating that "even though the use of a single average overcharge to demonstrate the impact of a conspiracy across the class can be problematic, Plaintiffs have laid a sufficient foundation for the inferential finding that the impact reflected in the single average overcharge was shared by virtually every class member.").  Here, Plaintiffs' experts provide no basis on which one can conclude that the average reimbursement differential they find between an IP and a chain pharmacy is shared by virtually every class member.  For this reason, the experts' use of

45

the average as a method for establishing antitrust impact fails the fit test because there is no valid scientific connection between the averages evidence and the pertinent inquiry of whether the differential was the result of anticompetitive behavior.

Finally, the regression model is unreliable because it finds damages for class members who have suffered no damage. Dr. Seguin testified in his deposition that his model's use of average reimbursements would result in finding damages for an IP that received the same reimbursement as a chain, as well as for an IP that received a larger reimbursement than a chain. (*See* ECF 261-8 at 54-57.[27])

Accordingly, the Plaintiffs' expert submissions fail to pass *Daubert* scrutiny. Caremark's Motion to exclude Plaintiffs' expert testimony is granted. Next, the Court considers the class certification issues.

---

[27] In discussing the one dollar average differential Dr. Seguin used to calculate damages, and presented with a hypothetical situation where there are two pharmacies in the same town, one an IP and one a chain outlet, and the chain received a reimbursement that was 50 cents per Lipitor prescription filled higher than the IP — rather than the one dollar average he applied — Dr. Seguin testified that "would necessarily mean some other independent pharmacy would get a dollar 50 per fill." (ECF 261-8 at 55:2-4.) When asked how he would determine "which pharmacy got the 50 cents and which got the dollar 50," Dr. Seguin testified "I haven't thought that through. I — I've suggested on way or [sic] allocating aggregate damages." (*Id.* at 55:7-9.) When asked if it was possible that in some areas IP are being paid the same reimbursement rates as chain outlets, he responded "[f]rom a probability point of view, it's possible. . . . And yes, under that one plausible solution I provided [i.e., the one dollar differential]; even though they're getting the same as the pharmacy across the street, they would still get a dollar for every Lipitor prescription they filled under that scenario, which I'm simply suggesting." (*Id.* at 55:11-56:7.)

When confronted with Dr. Hausman's evidence that the data show that 52.60% of IPs receive reimbursements that are greater than the median chain (see Hausman Report at 25; Table 3), Dr. Seguin continued to assert that "as a class, they suffered injuries of $300,000 for this drug." (ECF 261-8 at 115.) When asked to assume an example of an IP that had one Lipitor prescription fill in 2005 for which it received a higher reimbursement rate than a chain pharmacy, and asked whether it had "been harmed by the alleged conspiracy," Seguin stated that "[a]s a member of the class, they were harmed. Again, you're asking me — if you're willing to concede there that the class was harmed by $300,000; I'm willing to have a different discussion as to how to apportion that. And, you know, whether or not a particular independent pharmacist who filled one prescription at $80 deserves compensation or not is, I think, up to the counsel and class to decide." (Id. at 117:2-14.)

IV.     **The Class Action Motion**

To prosecute their two conspiracy claims under Section 1 of the Sherman Act, Plaintiffs

seek to certify the following Class pursuant to Rule 23(b)(2) and (b)(3) of the Federal Rules of

Civil Procedure:

> All independent pharmacies within the boundaries of the United States who
> contracted with Caremark or Advance PCS at any time during the period
> commencing four years prior to the filing of the initial complaint in this action
> through the present (the "Class Period"), to dispense and sell prescription drugs to
> members of a Caremark or Advance PCS network.  Excluded from the Class are
> any pharmacies owned or operated by Caremark or Advance PCS their
> subsidiaries, agents, principals or affiliated companies.

(ECF 248 at 1.)  They assert that the requirements for a (b)(2) injunctive relief class are met

because Caremark has "acted or refused to act on grounds generally applicable to the class,

thereby making appropriate final injunctive relief or corresponding declaratory relief with

respect to the class as a whole," Fed. R. Civ. P. 23(b)(2), and Caremark acted on grounds

generally applicable to the class making certification of Plaintiffs' claim for injunctive relief is

appropriate.  They assert that the requirements for a (b)(3) damages class are met because

common questions of law and fact predominate over any potential individualized questions and

because a class action is superior to any other means of adjudication.  (ECF 248 at 2.)  They

assert that they can establish common impact and damages utilizing class-wide proof through the

expert submissions of Dr. Cowan and Dr. Seguin.  Even though Plaintiffs' expert submissions

fail the *Daubert* analysis, the court will nevertheless provide its analysis of all Rule 23 issues.

a.     **Standard of Review**

The United States Court of Appeals for the Third Circuit requires rigorous assessment of

the available evidence to assure the prerequisites of Rule 23 are met and to "resolve factual

disputes by a preponderance of the evidence and make findings that each Rule 23 requirement is

met or is not met, having considered all relevant evidence and arguments presented by the parties." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d at 320.   A plaintiff "must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc." *Wal-mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (emphasis omitted). "Failure to meet any of Rule 23(a) or 23(b)'s requirements precludes certification." *Danvers Motor Co., Inc. v. Ford Motor Co.*, 543 F.3d 141, 147 (3d Cir. 2008).   It is the plaintiff's burden to prove by a preponderance of the evidence each of the prerequisites under Rule 23(a), and that the class fits within the desired categories of class actions set forth in Rule 23(b).   *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d at 307, 316 n. 14 (citation omitted); *Carrera v. Bayer Corp.*, 727 F.3d 300, 306 (3d Cir. 2013) (stating a plaintiff must show class action prerequisites by a preponderance of the evidence); *see Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349, 354 (3d Cir. 2013) ("It is plaintiff's burden to show that a class action is a proper vehicle for this lawsuit").   Rigorous analysis will frequently "entail some overlap with the merits of the plaintiff's underlying claim.   That cannot be helped.   '[T]he class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action.'" *Dukes*, 564 U.S. at 351 (alteration in original) (quoting *General Tel. Co. of SW v. Falcon*, 457 U.S. 147, 160 (1982)).

### b.      Rule 23(a) Requirements

Rule 23(a) requires that Plaintiffs meet four elements for class certification: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation.   If the requirements of Rule 23(a) are met, Plaintiffs seeking to certify a damages class must satisfy additional requirements of predominance and superiority required by Rule 23(b)(3).

### 1.      Numerosity

48

Under Rule 23(a), a plaintiff bears the burden of establishing numerosity by a preponderance of the evidence. *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 594-95 (3d Cr. 2012). Plaintiff must prove that the putative class is "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "No minimum number of plaintiffs is required to maintain a suit as a class action, but generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met." *Stewart v. Abraham*, 275 F.3d 220, 226-27 (3d Cir. 2001) (citing 5 James Wm. Moore et al., Moore's Federal Practice § 23.22[3][a] (Matthew Bender 3d ed. 1999)). We cannot "assume," "speculate," or defer to "common sense" with respect to how many class members exist. *Marcus*, 687 F.3d at 595-97. The plaintiff must produce evidence, direct or circumstantial, specific to the products, problems, parties, and geographic areas actually covered by the proposed class definitions to allow a court to make a factual finding on this requirement. *Id.* at 596.

Plaintiffs assert there are approximately 25,000 IPs throughout the United States that dispense approximately 1.3 billion prescriptions annually amounting to $60 billion dollars in prescription sales. (SAC ¶ 2.) Caremark's data establishes that in 2005 there were 11,741 IPs with data in Caremark's dataset and in 2008 there were 11,710. (Seguin Rebuttal at 2 n.1.) Caremark makes no specific argument on the numerosity requirement, and Plaintiffs have satisfied the requirement.

## 2.    Commonality

"A putative class satisfies Rule 23(a)'s commonality requirement if 'the named plaintiffs share at least one question of fact or law with the grievances of the prospective class.'" *Reyes v. Netdeposit, LLC*, 802 F.3d 469, 486 (3d Cir. 2015) (citing *Rodriguez v. Nat'l City Bank*, 726

F.3d 372, 382 (3d Cir. 2013)).  "Commonality does not require perfect identity of questions of law or fact among all class members.  Rather, even a single common question will do."  *Id.*, 802 F.3d at 486 (citing *Dukes*, 564 U.S. 338).   The commonality inquiry turns on whether determining the truth or falsity of a common contention will resolve an issue that is central to the validity of each one of the claims in one stroke.  *Id.* at 487. "What matters to class certification . . . is not the raising of common questions — even in droves — but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Dukes*, 564 U.S. 338, 131 S.Ct. 2541, 2551 (emphasis and ellipsis in the original).  The bar for establishing commonality is "not high" and is "easily met."  *In re Cmty. Bank of N. Va. Mortg. Lending Practices Litig.*, 795 F.3d 380, 397 (3d Cir. 2015); *Reyes*, 802 F.3d at 486 (citing *Baby Neal v. Casey*, 43 F.3d 48, 56 (3d Cir. 1994)).[28]

Plaintiffs argue that, in addition to the "overarching common question of whether Caremark entered into the conspiracies alleged in the complaint," the following questions of law and fact are common to the Class:

> (a) whether the existence of such an understanding, agreement or conspiracy fixed, maintained or stabilized prices for dispensing services and/or prescription drugs below what would otherwise prevail in a competitive market;
> (b) whether Caremark diverted health plan members to its parent company, CVS;
> (c) whether Caremark required pharmacies to dispense and sell drugs on a formulary as a condition of reimbursement and whether such conduct supports a claim that Defendants violated Section 1 of the Sherman Act;
> (d) whether Plaintiffs and Class members suffered antitrust injury as a result of the alleged conspiracy to fix prices paid to independent pharmacies for dispensing services and/or sale of prescription drugs;
> (e) whether Plaintiffs and Class members were damaged as a result of the alleged

---

[28] Where the class is proposed to be certified under Rule 23(b)(3), district courts typically analyze Rule 23(a)'s commonality requirement together with the more stringent predominance requirement of Rule 23(b)(3).  *Reyes*, 802 F.3d at 486; *see Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 297 (3d Cir. 2011).  The Third Circuit, however, recently cautioned that commonality must be established *before* predominance can be considered.  *Reyes*, 802 F.3d at 486 (emphasis in original).

conspiracy to fix prices to independent pharmacies for dispensing services and/or
sale of prescription drugs; and
(f) whether class members are entitled to injunctive relief.

(Pl. Mem. at 7.)

Caremark responds that, although Plaintiffs list these six issues they assert are common,
they have not met their burden to show that they are common to all class members.  It argues that
because Issues (a), (d), and (e) all relate to whether any conspiracy fixed prices below what
would prevail in a competitive market and whether class members suffered antitrust injury and
damages, and because the factors that affect reimbursement rates in both the real world and the
"but-for" world described by Plaintiffs' experts differ from one putative class member to the
next, there are no common questions across the proposed class.  With respect to Issues (b) and
(c), addressing whether Caremark diverted health plan members to CVS and whether Caremark
required some pharmacies to dispense and fill drugs as a formulary, Caremark challenges
whether they can be "common" questions because they are unrelated to the Sherman Act
violations Plaintiffs allege, and Plaintiffs do not describe how any of the actions caused them
antitrust injury.   Caremark offers no argument to rebut whether Plaintiffs' "overarching"
common issue of the existence of the alleged conspiracies is common.

Because the commonality element does not require perfect identity of questions of law or
fact among all class members, Caremark's arguments are rejected.  Common questions clearly
exist, specifically whether Caremark engaged in the antitrust conspiracies detailed in the SAC.
Answers to the questions asserted by the Plaintiffs as common will drive the resolution of the
litigation.

### 3.      Typicality

The typicality requirement aids a court in determining whether maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence. *Marcus*, 687 F.3d at 597-98 (citing *General Telephone Co. of the Sw.*, 457 U.S. at 158 n. 13).   Typicality "screen [s] out class actions in which the legal or factual position of the representatives is markedly different from that of other members of the class even though common issues of law or fact are present."   *Id.* at 598.   To determine whether a plaintiff's position is markedly different from the class as a whole, courts compare three distinct, though related, concerns: (1) the claims of the class representative must be generally the same as those of the class in terms of both (a) the legal theory advanced and (b) the factual circumstances underlying that theory; (2) the class representative must not be subject to a defense that is both inapplicable to many members of the class and likely to become a major focus of the litigation; and (3) the interests and incentives of the representative must be sufficiently aligned with those of the class. *Marcus*, 687 F.3d at 599.

The named Plaintiffs in *Caremark* assert that their claims arise from the same course of conduct that gives rise to the claims of absent class members, and their claims are based on the same legal theory.   They contend they will advance the interests of absent class member because they must show that Caremark engaged in an unlawful combination or conspiracy to fix the prices that all participating independent pharmacies are paid for dispensing services and/or prescription drugs. They also contend that they possess no antagonistic interests or conflicts with the absent class members.

Caremark responds the typicality requirement is absent because the named Plaintiffs'
economic experience is directly contrary to the injury that they allege on behalf of their proposed
class. Specifically, it asserts that the relevant markets in this case are highly diverse local retail
pharmacy markets, meaning that the named Plaintiffs' proof of antitrust impact and the resulting
anticompetitive effects will differ significantly from the proof for the hundreds of other local
pharmacy markets across the country. If the named Plaintiffs were able to prove that lower
reimbursement had caused anticompetitive effects of higher prices and reduced output in Jackson
County, Alabama, Caremark argues that it would prove nothing about whether prices were
higher and output was lower in other markets (such as urban areas) with characteristics different
from those of Jackson County. It notes that Dr. Hausman has provided evidence that IPs in
Jackson County received $1,490 more than they would have received had they been
compensated at the rate received by competing local chain outlets. (*See* Hausman Report at 16-
17 and Table 1.) It notes too that Dr. Cowan has conceded that dispensing fees received by the
named Plaintiffs were in line with chain outlets in their markets, and they therefore suffered no
antitrust injury. (*See* ECF 261-12 (May 4, 2006 Dep. of Charles D. Cowan, Ph.D.) at 481:24-
485:15, 487:2-13.[29]) From this evidence, Caremark argues (1) since the named Plaintiffs have

---

[29] On the issue of whether named Plaintiffs received dispensing fees equal to or greater
than chain outlets in their home markets, Dr. Cowan conceded in his deposition that "[s]ome of
the information that I saw from the first case told me that the dispensing fees that they received
seemed to be in line with other chains that were in their market." (ECF 261-12 at 482:4-7.) He
maintained, however, that the data did not affect his analysis "because I just got through
describing an analysis that **compared averages** across a set of variables, and this is a specific
independent pharmacy." (*Id.* at 483:19-22 (emphasis added).) On the issue of whether named
Plaintiff Big C suffered an antitrust injury, Dr. Cowan testified "I simply haven't thought about
how to look at individual pharmacies relative to the tests that I offered." (*Id.* at 486:22-24.) He
further testified: "Q. Well, one of the things you propose in your report, is it not, that, in
computing damages, for example, you would compare the predicted dispensing fee versus the
actual dispensing fee. Right? A. Yes. **Q. Now, if you applied that method to Big C — A.**

not individually suffered the type of antitrust injury that they allege on behalf of the putative

class, and (2) various members of the proposed class have divergent circumstances and interests,

the named Plaintiffs fail to meet Rule 23(a)'s typicality and adequacy requirements.  (*See* ECF

261 at 47-48 (citing *E. Texas Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977)

(noting that, in order to satisfy typicality, the proposed class representative must show that it

"possess[es] the same injury" as other class members); *Williams v. Empire Funding Corp.*, 227

F.R.D. 362, 373 (E.D. Pa. 2005) (stating that class representative was not typical and adequacy

was in doubt when she could not show damages caused by the conduct on which the class claim

was based); *Blue v. Defense Logistics Agency*, 181 F. App'x. 272, 275 (3d Cir. 2006) (holding

that claimant not was an adequate representative where, among other reasons, she has not made

prima facie showing of discrimination)).

The named Plaintiffs refute Caremark's assertion that they are atypical of the Class

because they received reimbursements above those received by local chain outlets, asserting that

this "conclusion is premised on the erroneous notion that an Independent Pharmacy must have

been reimbursed at a rate below that of local chains on each and every drug in order to have been

injured or sustained damages, while in actuality the injury and damages to Independent

Pharmacies are measured against the reimbursements they would have received absent the

conspiracy."  (ECF 269 at 3.)

The named Plaintiffs in *Caremark* have failed to meet their burden to show that their

claims are typical of the class they seek to represent.  They produced no evidence that they

received reimbursements that were lower than the chain competitors in their markets while

Caremark produced evidence that they received reimbursements equal to or greater than their

---

**Um-hmm. Q.  — you would get a 0 measure of damages.  Right?  A.  Yes.**"  (*Id.* at 487:2-13
(emphasis added).)

54

chain competitors.  Given this class certification record, the named Plaintiffs are clearly subject
to a defense that is both inapplicable to many members of the class and likely to become a major
focus of the litigation, namely whether they have suffered an antitrust injury resulting from the
conspiracies they allege.  An antitrust injury is an "injury of 'the type the antitrust laws were
intended to prevent and that flows from that which makes defendants' acts unlawful.  The injury
should reflect the anti-competitive effect either of the violation or of anti-competitive acts made
possible by the violation." *Eichorn v. AT & T Corp.*, 248 F.3d 131,140 (3d Cir. 2001) (quoting
*Brunswick Corp.*, 429 U.S. at 489).  Because the record shows the named Plaintiffs failed to put
on evidence that they received lower reimbursements, they cannot show they suffered the same
effect of the anti-competitive conspiracies they allege.  Thus, they fail the typicality requirement.

### 4.       Adequacy

The fourth requirement in Rule 23(a) is that the representative plaintiffs must "fairly and
adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  Adequacy concerns both
"the experience and performance of class counsel" and "the interests and incentives of the
representative plaintiffs."  *Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170, 181 (3d Cir.
2012) (citing *In re Cmty. Bank of N. Va.*, 418 F.3d 277, 303 (3d Cir. 2005).  "The principal
purpose of the adequacy requirement is to determine whether the named plaintiffs have the
ability and the incentive to vigorously represent the claims of the class."  *Community Bank III*,
795 F.3d at 393 (quoting *In re Cmty. Bank of N. Va.*, 622 F.3d 275, 291 (3d Cir. 2010)
(*Community Bank II*)).  In fact, "'the linchpin of the adequacy requirement is the alignment of
interests and incentives between the representative plaintiffs and the rest of the class.'"
*Community Bank III*, 795 F.3d at 393 (quoting *Dewey*, 681 F.3d at 183).  This inquiry is closely
tethered to the typicality inquiry, *see Danvers Motor Co., Inc.*, 543 F.3d at 149, and ensures that

the named plaintiff's claims "are not antagonistic to the class."  Id. at 150 (citing *Beck v. Maximus, Inc.*, 457 F.3d 291, 296 (3d Cir. 2006)).

While the named Plaintiffs in *Caremark* assert that they are not aware of any conflict that would prevent them from serving in the capacity as named representatives and contend that their interests in successful prosecution of the claims asserted in the SAC are aligned with the interest of absent class members since the nature of antitrust claims and the injury that flows from an unlawful conspiracy and/or combination to restrain trade are identical, they do not satisfy the adequacy requirement for the same reason that they fail to satisfy the typicality requirement.  As they have not demonstrated that they have individually suffered the type of antitrust injury that they allege on behalf of the putative class, their interests diverge from other members of the proposed class who allegedly have received lower reimbursements as a result of anticompetitive activity.[30]

### b.    Ascertainability and Cohesiveness

For a class to be certified under Rule 23(b)(3), it must also be "ascertainable."  *See Carrera*, 727 F.3d at 306 ("Class ascertainability is 'an essential prerequisite of a class action, at least with respect to actions under Rule 23(b)(3).'") (quoting *Marcus*, 687 F.3d at 592-93); *see also Byrd v. Aaron's Inc.*, 784 F.3d 154, 162 (3d Cir. 2015), as amended (Apr. 28, 2015) (stating "the ascertainability requirement as to a Rule 23(b)(3) class is grounded in the nature of the class-action device itself").

The ascertainability element "functions as a necessary prerequisite (or implicit requirement) because it allows a trial court effectively to evaluate the explicit requirements of Rule 23."  *Byrd* at 162.  It is an independent inquiry, in addition to the Rule 23 requirements, that

---

[30] There is no suggestion that counsel does not possess the experience or skill necessary to adequately represent the class.

"ensures that a proposed class will actually function as a class." *Id.* To satisfy the ascertainability prerequisite, Plaintiffs must show by a preponderance of the evidence that the class is "currently and readily ascertainable based on objective criteria," *Marcus*, 687 F.3d at 593, and the court "must undertake a rigorous analysis of the evidence to determine if the standard is met." *Carrera*, 727 F.3d at 306. "[A]scertainability and a clear class definition allow potential class members to identify themselves for purposes of opting out of a class. Second, it ensures that a defendant's rights are protected by the class action mechanism. Third, it ensures that the parties can identify class members in a manner consistent with the efficiencies of a class action." Id. Accordingly, courts must "ensure that class members can be identified 'without extensive and individualized fact-finding or "mini-trials."'" *Id.* (quoting *Marcus*). "[T]o satisfy ascertainability as it relates to proof of class membership, the plaintiff must demonstrate that his purported method for ascertaining class members is reliable, administratively feasible, and permits a defendant to challenge the evidence used to prove class membership." *Id.* The Third Circuit has also recently reiterated that "a party cannot merely provide assurances to the district court that it will later meet Rule 23's requirements. . . . Nor may a party 'merely propose a method of ascertaining a class without any evidentiary support that the method will be successful.'" *Byrd*, 784 F.3d at 164 (quoting *Carrera* 727 F.3d at 306, 307, 311) (internal citation omitted).

While a Rule 23(b)(2) class need not meet the ascertainability requirements that apply to Rule 23(b)(3) classes, *see Shelton v. Bledsoe*, 775 F.3d 554, 563 (3d Cir. 2015) ("[A]scertainability is not a requirement for certification of a (b)(2) class seeking only injunctive and declaratory relief, such as the putative class here."), such a class must be sufficiently cohesive. *Barnes v. Am. Tobacco Co.*, 161 F.3d 127, 143 (3d. Cir. 1998) ("While 23(b)(2) class

actions have no predominance or superiority requirements, it is well established that the class claims must be cohesive.").  An injunctive relief class must also be properly defined.  "A properly defined 'class' is one that: (1) meets the requirements of Rule 23(a); (2) is sufficiently cohesive under Rule 23(b)(2) and [the Third Circuit's] guidance in *Barnes*, 161 F.3d at 143; and (3) is capable of the type of description by a 'readily discernible, clear, and precise statement of the parameters defining the class,' as required by Rule 23(c)(l)(B) and [the Third Circuit's] discussion in *Wachtel* [*v. Guardian Life Ins. Co. of Am*], 453 F.3d [179] at 187 [(3d Cir. 2006)]." *Shelton*, 775 F.3d at 563.

The cohesiveness requirement protects two interests.  The first interest is in protecting unnamed class members, who "are bound by the action without the opportunity to withdraw and may be prejudiced by a negative judgment in the class action." *Barnes*, 161 F.3d at 143.  The cohesiveness requirement protects this interest by ensuring that "significant individual issues do not pervade the entire action because it would be unjust to bind absent class members to a negative decision where the class representatives' claims present different individual issues than the claims of the absent members present." *Id.* (citations and quotation marks omitted).  The second interest is in ensuring that the litigation remains manageable.  If a class is not sufficiently cohesive, "the suit could become unmanageable and little value would be gained in proceeding as a class action if significant individual issues were to arise consistently." *Id.* (quotation marks, citations, and alterations omitted).

To satisfy the cohesiveness test, Plaintiffs must show that the "class's claims are common ones and that adjudication of the case will not devolve into consideration of myriad individual issues."  Newberg on Class Actions § 4:34.  "In other words, Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class.  It

does not authorize class certification when each individual class member would be entitled to a *different* injunction or declaratory judgment against the defendant." *Dukes*, 564 U.S. at 360 (emphasis in original).  The Third Circuit has held  that any "'disparate factual circumstances of class members' may prevent a class from being cohesive." *Gates*, 655 F.3d at 264 (citing *Carter v. Butz*, 479 F.2d 1084, 1089 (3d Cir. 1973).  Courts have the discretion to deny certification in the presence of disparate factual circumstances.  *Geraghty v. U.S. Parole Comm'n*, 719 F.2d 1199, 1205 (3d Cir. 1983).  "The key to the (b)(2) class is 'the indivisible nature of the injunctive or declaratory remedy warranted — the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.'"  *Dukes*, 564 U.S. at 360 (quoting Nagareda, *The Preexisting Principle and the Structure of the Class Action*, 103 Colum. L. Rev. 149, 176 n. 110 (2003)).

Plaintiffs in *Caremark* contend that the proposed Rule 23(b)(3) class can be readily ascertained because Caremark's data contains the name of the pharmacy that filled each prescription.  Caremark makes no specific argument on the ascertainability requirement, and the Plaintiffs' evidence satisfies the ascertainability requirement.   Neither party has specifically addressed the cohesiveness requirement to certify a Rule 23(b)(2) injunctive relief class. Nonetheless, the lack of cohesion is clear upon examination of the same reasons, writ larger, that the named Plaintiffs fail the typicality test, as well as those discussed earlier in the *Daubert* context.  The record demonstrates that the market for retail pharmacy services is highly diverse and local.   Proof by use of averages that some members suffered antitrust injury from the anticompetitive effects of the alleged conspiracy does not constitute common evidence that they all did, that they all suffered the same antitrust injury, or that the same injunctive relief is appropriate.   Accordingly, the putative class members' disparate factual circumstances prevent

the proposed national injunctive class from being sufficiently cohesive to ensure that injunctive relief is manageable.

### c.     Rule 23(b) Requirements

A class action can be certified under Rule 23(b)(3) if (1) the questions of law or fact common to class members predominate over any questions affecting only individual members, and (2) a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.  Fed. R. Civ. P. 23(b)(3).  The Rule provides that the following matters are pertinent to these findings: (1) the class members' interests in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already begun by or against class members; (3) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (4) the likely difficulties in managing a class action.  Id.

### 1.     Predominance

"Considering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action."  *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011); *see also In re Modafinil Antitrust Litig.*, 837 F.3d 238, 260 (3d Cir. 2016) (stating that the predominance inquiry "is especially dependent upon the merits of a plaintiff's claim, since the nature of the evidence that will suffice to resolve a question determines whether the question is common or individual.") (quoting *In re Constar Int'l Inc. Sec. Litig.*, 585 F.3d 774, 780 (3d Cir. 2009) (internal quotation marks omitted in *In re Modafinil*).)  We "must examine each element of a legal claim 'through the prism' of Rule 23(b)(3)."  *Marcus*, 687 F.3d at 600 (citing *In re DVI, Inc. Sec. Litig.*, 639 F.3d 623, 630 (3d Cir. 2011)).  To obtain class certification, "[a] plaintiff must demonstrate that the element of the

[legal claim] is capable of proof at trial through evidence that is common to the class rather than individual to its members." *Marcus*, 687 F.3d at 600 (citation omitted).  If proof of an element of the legal claim requires individual treatment, then class certification is unsuitable.  *See Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) (stating that "[a]n individual question is one where members of a proposed class will need to present evidence that varies from member to member, while a common question is one where the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof.") (internal quotation marks omitted) (citing Newberg on Class Actions § 4:50, pp. 169-197); *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d at 311-312 (stating that "the task for plaintiffs at class certification is to demonstrate that the element [] is capable of proof at trial through evidence that is common to the class rather than individual to its members.  Deciding this issue calls for the district court's rigorous assessment of the available evidence and the method or methods by which plaintiffs propose to use the evidence to prove [the elements] at trial."); *see also* Fed. R. Civ. P. 23 advisory committee's note to 2003 amendment ("A critical need is to determine how the case will be tried.").

Horizontal price-fixing is a per se violation of § 1 of the Sherman Antitrust Act.  *See, e.g.*, *Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 647 (1980); *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 218 (1940).  To prevail on their per se inter-PBM price-fixing claim under § 1 of the Sherman Act, Plaintiffs must prove three elements: (1) a conspiracy to fix prices in violation of the antitrust laws; (2) the antitrust impact of the unlawful activity; and (3) damages sustained as a result of the unlawful activity. *See, e.g., In re Linerboard Antitrust Litig.*, 203 F.R.D. 197, 214 (3d. Cir. 2001); (citing *In re Plastic Cutlery Antitrust Litig.*, Civ. A. No. 96-728, 1998 WL 135703, *5 (E.D. Pa. Mar. 20, 1998) ("In a price-fixing antitrust class action,

plaintiffs must establish that both the defendants' violations of law and the impact of those violations on the class members involve predominantly common issues. Plaintiffs must therefore make a threshold showing that the element of impact will predominantly involve generalized issues of proof, rather than questions which are particular to each member of the plaintiff class." (internal citations omitted)). As previously discussed, Plaintiffs also must show "that the damages resulting from that injury were measurable on a class-wide basis through use of a common methodology." *Comcast Corp.*, 133 S. Ct. at 1430 (quotation marks omitted). A model purporting to serve as evidence of damages in a class action must measure only those damages attributable to the theory upon which liability is premised. *Id.* Where the damages evidence does not translate the relevant "'legal theory of the harmful event into an analysis of the economic impact of that event,'" the *Comcast* Court determined that common questions could not predominate over individual ones. *Id.* at 1435 (quoting Federal Judicial Center, Reference Manual on Scientific Evidence 432 (3d ed. 2011)).[31]

Plaintiffs' argument that common questions can be proven through evidence that is common to the class rather than individual to its members (*see* ECF 248 at 15) must be rejected for similar reasons undergirding the *Daubert* analysis.

### A.    Common Evidence of a Per Se Violation

Because "[t]he essence of any violation of § 1 is the illegal agreement itself," it is not necessary for a plaintiff to prove that "overt acts [were] performed in furtherance of it." *Summit Health, Ltd. v. Pinhas*, 500 U.S. 322, 330 (1991) (citing *United States v. Kissel*, 218 U.S. 601

---

[31] The Third Circuit has held, however, that it is "a misreading of *Comcast*" to interpret it as "preclud[ing] certification under Rule 23(b)(3) in any case where the class members' damages are not susceptible to a formula for classwide measurement." *Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 375 (3d Cir. 2015) (quoting *Comcast*, 133 S.Ct. at 1437 (Ginsburg, J. & Breyer, J., dissenting) (citing 2 William B. Rubenstein, Newberg on Class Actions § 4:54 (5th ed.2012))) (collecting cases).

(1910)); *see also*, *Socony-Vacuum Oil Co.*, 310 U.S. at 224, n. 59 ("[C]onspiracies under the Sherman Act are not dependent on any overt act other than the act of conspiring."). Nor is it necessary to prove that the conspiracy was actually successful in raising prices. *Id.* ("It is the contract, combination . . . or conspiracy, in restraint of trade or commerce which § 1 of the Act strikes down, whether the concerted activity be wholly nascent or abortive on the one hand, or successful on the other.") (quotation marks omitted).

Accordingly, to meet the predominance requirement, Plaintiffs seeking class certification of a per se antitrust claim must show by common evidence that a conspiracy existed, which may be done through either direct evidence, such as an express agreement, or circumstantial evidence, such as parallel conduct and course of dealing. *See, e.g.*, *In re EPDM*, 681 F. Supp. 2d at 166 ("To prove the existence of an express, manifested agreement, the antitrust plaintiff should present 'direct or circumstantial evidence that reasonably tends to prove that the manufacturer and others had a conscious commitment to a common scheme designed to achieve an unlawful objective.'") (quoting *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984)); *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 252 (2d Cir.1987) ("[A]t a minimum," a jury must be able to conclude that "the conspirators had a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement" (quotation omitted)); *United States v. Paramount Pictures*, 334 U.S. 131, 142 (1948); *Am. Tobacco Co. v. United States*, 328 U.S. 781, 800 (1946). In the class action context, pre-*Hydrogen Peroxide* cases generally accepted that "allegations of the existence of a price-fixing conspiracy are susceptible to common proof and, if proven true, would satisfy the first element of . . . [an] antitrust cause of action." *Cordes &Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 105 (2d Cir. 2007). In the post-

*Hydrogen Peroxide* world, the "if proven true" part of the formulation takes on new imperative since courts may no longer merely assume that allegations can be proven later at trial.

The allegations here against the PBMs include fixing and artificially depressing the prices paid to IPs, conspiring to use their combined monopolistic market power to force unconscionable reimbursement rates, acting as a conduit for the Client Payors to engage in horizontal restraint of trade by removing IP competitors, using market power to stabilize and repress the fees IPs would be able to charge in a free and open market, and diverting health plan members to their mail order businesses. (SAC ¶ 5.) Dr. Cowan opines that Caremark's actions "have the effect of price-fixing, eliminating competition, indirect collusion among the PBMs, and an attempt to drive independent pharmacies out of the market." (Cowan Report at 24.) He then goes on to offer criteria by which it may be determined whether IPs "are being treated differentially after other factors, such as size, are accounted for." (*Id.* at 27.) He opines that if the average of "dispensing fee contract values falls below the bounds established in determining the size to fee relationship," this would indicate that prices have been fixed and fees paid to IPs are artificially low. (*Id.* at 34.) He proposes that, if there is no natural variability in the contract values between IPs and PBMs — in other words all contracts with the PBMs vary much less than they do for the PBMs' contracts with pharmacies with six or more stores — then there is also an indication of price collusion. (*Id.* at 35.) Dr. Cowan has not, however, actually studied these criteria in order to provide common evidence of price fixing. (*Id.* at 37.) Dr. Seguin also did not attempt to provide common evidence of price fixing. He assumed price fixing had occurred and endeavored only to calculate the resulting damages. Thus, there has been no actual evidence, common or otherwise, offered on the basic issue of whether a price fixing conspiracy existed.

### B.      Common Evidence of a Rule of Reason Violation

The *Daubert* analysis fully sets forth the reasons why Plaintiffs fail to show that their rule of reason violation is capable of being proven by evidence that is common to the class rather than individual to its members.  They have offered no evidence to establish the geographic market or Defendants' market power.  Not only are their experts' conclusions on antitrust impact unreliable, there is also a failure to demonstrate that the claim is capable of proof through common evidence.

### C.      *Comcast*

Plaintiffs' proposed damages model fails the *Comcast* test, and thus cannot serve as common evidence of predominance, because the damages model does not matchup with Plaintiffs' theories of liability.  Having already discussed this problem at length in the *Daubert* analysis, it serves merely to reiterate that Dr. Seguin made no effort to determine which portion of the class's purported damages result from which alleged conspiracy (*see* Seguin Sept. 11, 2015 Dep. at 132:6-15), and he was not even aware of the nature of the conspiracies alleged by Plaintiffs when he conducted his study.  (Seguin Mar. 19 2015 Dep. at 72:19-73:15.)

Importantly, Dr. Seguin failed to isolate the difference in reimbursement rates attributable to an alleged antitrust conspiracy from any difference attributable to legitimate bargaining power or other market factors.  Merely assuming that any difference observed has to be the result of Plaintiffs' allegations of antitrust behavior is insufficient, and Dr. Seguin admitted that could not say that the difference he observed was the result of any conspiracy alleged in the SAC.  Rather, he did not consider any potential causes other than illegal activity.  (*See* Seguin Mar. 19, 2015 Dep. at  71:18-72:1,  75:21-76:23.)   This failure to isolate differentials solely due to anti-competitive activities is fatal since Dr. Cowan recognized that reimbursement rates between IPs

and chains could differ in the absence of anticompetitive behavior.  (*See* Cowan Sept. 11, 2015 Dep. at 40:1-4 ("Q: So in the but-for world, you would still expect the PBM to have different reimbursement rates to different pharmacies; correct?  A: Within reason, yes."); *see also id.* at 98:15-25 ("I'm allowing for variation [in reimbursement rates between pharmacies.]").)  Both experts also recognized that legitimate bargaining power can explain the differential.  (*See* Cowan Report at 42; Seguin Sept. 11, 2015 Dep. at 72:8-73:11.)  While Dr. Cowan warned that, in examining the variability in reimbursements, one must examine if there is natural variability in the contract values between IPs and PBMs, as well as control for market concentration and other factors (*see* Cowan Report at 34, 39), Dr. Seguin did not do this.  Accordingly, Plaintiffs' damages model cannot serve as common evidence.

### D.    Reliance on Averages

Dr. Seguin's reliance on averages fails to comply with the *Hydrogen Peroxide* imperative that Plaintiffs show that every member of the putative class suffered an antitrust injury.  His conclusion that there is a nationwide average differential of approximately $1.00 between the reimbursement rate paid to IPs and chains is then used in his regression model that considers only one explanatory variable, namely whether the pharmacy is an IP or a chain.  As Dr. Hausman explains, this parsimonious model fails to account for market forces that can explain the differential independent of the conspiracies alleged by the Plaintiffs, including local market density and local costs of doing business.  Again, having already discussed this problem at length in the *Daubert* analysis, the Rule 23(b)(3) predominance problem stemming from the Seguin model's use of averages is the failure to discount other causes of the observed average reimbursement differential in order show common evidence that *all* putative members were impacted by the anticompetitive conduct.  *See*  Areeda, Hovenkamp, Blair, Durrance, *Antitrust*

*Law* ¶ 398 (4th ed. 2014) (stating that to satisfy predominance, "even in a per se case . . . it is necessary to prove that *all* class members suffered injury to their business or property using common proof." (emphasis added)).  Evidence that IPs received *on average* $1.00 less than a chain pharmacy is not evidence that every IP received less and was thus impacted.  Combined with Dr. Hausman's unrebutted evidence that 52.6% of IPs received a higher reimbursement than the 50th percentile chain pharmacy, and that the named Plaintiffs themselves received above average reimbursements compared to the chain pharmacies they directly competed against, Plaintiffs have failed to show antitrust impact by evidence that is common to the class through Dr. Seguin's parsimonious model.[32]  *See In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 252 (D.C. Cir. 2013) (holding that while plaintiffs do not need to be prepared at the certification stage to demonstrate through common evidence the precise amount of damages incurred by each class member, "we do expect the common evidence to show all class members suffered *some* injury") (emphasis in original).

## E.   Local Market Variation

Because Dr. Seguin assumes a national market for retail pharmacy sales, his model fails to account for the effect of local market forces on reimbursement rates differentials.  Dr. Hausman's test of Seguin's model found there was a less than one percent probability to Dr. Seguin's assumption that reimbursement rate differentials was consistent nationwide.  While Seguin opines that he has undertaken to judge the robustness of his model by incorporating three

---

[32] It must be noted that even after being presented with Dr. Hausman's criticism of his use of averages, Dr. Seguin prepared additional charts that still used averages.  (*See* Seguin Rebuttal at 5-6.)  Dr. Seguin's rebuttal to Dr. Hausman's criticism of his use of averages is unmoving.  Seguin asserts that the problem is merely one of how the average differential "should be allocated among class members."  (*Id.* at 15.)  That is not the problem; the use of averages evidence is flawed because it does not constitute class-wide evidence of antitrust impact.  It shows only that some members were allegedly impacted but does not show that they all were.

local variables, it must be noted that two of those variables — the number of pharmacies within a zip and the median income within a zip — reduced his $1.00/prescription fill differential estimate to $0.54.  (*See* ECF 261-7 at 162:12-23.)  The evidence of local variation and lack of robustness supporting a national geographic market is particularly problematic for considering whether common evidence predominates for Plaintiffs' Plan Sponsor conspiracy claim that is subject to rule of reason analysis.  It is counterintuitive to think of the geographic market for retail pharmacy sales as national.  Dr. Hausman aptly opines that a consumer in Alabama would not consider a pharmacy in Wisconsin to be an option to fill a prescription.

**F.      Evidence that the Number of IPs is Declining**

Dr. Cowan's alternative method of using data on the declining market share for IPs and Dr. Seguin's data showing different CAGRs for chains and IPs must also be rejected as common evidence of antitrust impact.  Dr. Seguin's data on market share showing that the chain group had an increase in the relative number of outlets of 19.2% over the period from 2002 to 2012, or a CAGR of 1.8%, versus data indicating that the market share of IPs fell with a CAGR of - 0.15%, does not attempt to relate the perceived differential to the anticompetitive conduct alleged in the SAC.  While Seguin opines that the decline in the number of IP outlets over this period "strongly suggests" common harm to IPs "due to discriminatory reimbursement by PBMs," (Seguin Report at 11), he conceded at his deposition that there were "numerous potential explanations" why the relative number of chain outlets rose compared to IPs, and that he had not tested any of those explanations in order to discount them.  (ECF 261-7 at 211.)  Because, as already noted, antitrust laws protect competition and not competitors, whether certain competitors' market shares have declined is not alone common evidence of an antitrust violation.

## 2.      Superiority

The superiority requirement "'asks the court to balance, in terms of fairness and efficiency, the merits of a class action against those of alternative available methods of adjudication.'"  *In re Processed Egg Prods. Antitrust Litig.*, 284 F.R.D. 278, 293-94 (E.D. Pa. 2012) (quoting *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 316 (3d Cir. 1998).  Courts use the four factors listed in Rule 23(b)(3) — (1) the class members' interests in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already begun by or against class members; (3) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (4) the likely difficulties in managing a class action — to make the determination.  While Plaintiffs assert that no putative member of the class has expressed an interest in individually controlling a separate action and that managing a class action will not be difficult, the prior discussion of the typicality and predominance elements makes it clear that class treatment is not a superior method of adjudicating Plaintiffs' antitrust conspiracy claims. The different way that the alleged anticompetitive activities may have impacted individual IPs' reimbursement rates makes collective management of claims particularly difficult.

## V.      The Decertification Motion in *Express Scripts* and *Medco*

On March 3, 2006, the transferee court in the Northern District of Alabama certified a class of all independent pharmacies in the United States who contracted with any of the named Defendants "to dispense and sell prescription drugs to members of a defendant network."[33] (ECF 153-4 at 13-14 ("the Alabama certification order").)  Like the lead case, the Plaintiffs in

---

[33] The order provides that the class period "commences four years before the filing of this Complaint through the present," and the class definition excludes "any pharmacies owned or operated by any of the Defendants, their subsidiaries, agents, or principals, etc."  (ECF 153-4 at 13-14.)

*Express Scripts* and *Medco* allege two separate conspiracies in violation of Section 1 of the Sherman Act:  (1) a "client-payor conspiracy" wherein each PBM allegedly conspired with its thousands of clients to lower the reimbursement rates paid to IPs for dispensing prescription drugs to plan members; and (2) a "PBM conspiracy" wherein Medco, Express Scripts, and Caremark conspired with each other (and other unnamed PBMs) to lower the reimbursement rates paid to IPs.  (*Id.* at 4.)  The alleged purpose of the conspiracies was to engage in horizontal price fixing to artificially depress the reimbursements paid to pharmacies for drugs and professional services.  (*Id.* at 4-5.)

Defendants argue that the class created by the Alabama certification be decertified for four reasons:  (1) to reconcile the case analytically with the other pending cases since the class definitions overlap; (2) the Alabama certification order fails to comply with Third Circuit law and the specificity required by the amendments to Federal Rule of Civil Procedure 23(c)(1)(B); (3) the order was not grounded upon specific, market-based evidence, which Third Circuit law requires in order to demonstrate that a plaintiff can use common proof to show the impact of the alleged antitrust violation; and (4) the Plaintiffs cannot now meet their burden to show that common questions predominate over questions affecting only individual class members.  Plaintiffs respond that (1) the principles of comity require that the Alabama certification order be respected, and (2) Defendants' request is contrary to the recent trend by MDL transferee courts to send class certification issues back to the transferor courts.  Because the Alabama certification order has been rendered deficient by intervening changes in the law, the class must be decertified.

        **a.**       **Preliminary Issue:  Rule 23(c)(1)(C), Comity, and Preclusive Effect of the Alabama Certification Order**

Shortly after the cases comprising the MDL were transferred to the United States District Court for the Eastern District of Pennsylvania, the Hon. John P. Fullam concluded that the Alabama certification order "does not comply with the requirements of Fed. R. Civ. P. 23(c)(1)(B), since the order does not define the class and the class claims, issues, or defenses." (Order of Feb. 21, 2007, ECF 42, at 1.)  Judge Fullam's order was filed after the pending motion to decertify was filed of record and recognized that Defendants' raised substantial arguments that the certification order was probably defective and inconsistent with prevailing law since he stated that "further information" was needed "in reaching a correct decision as to class certifications." (*Id.*)

This Order, as well as the pending motion to decertify, are fully consistent with the authority granted by Rule 23(c)(1)(C) stating that an "order that grants or denies class certification may be altered or amended before final judgment."  Fed. R. Civ. P. 23(c)(1)(C). They are also consistent with Third Circuit precedent.  *See Barnes*, 161 F.3d at 140 (stating that "[u]nder Rule 23(c)(1), district courts are required to reassess their class rulings as the case develops"); *Zenith Labs., Inc. v. Carter-Wallace, Inc.*, 530 F.2d 508, 512 (3d Cir. 1976) (stating that law of the case rules do not apply to class certification rulings).

Plaintiffs' argument that comity should be granted to the Alabama court's decision is thus ill grounded.  Granting comity — and thus setting in stone a transferor court's certification decision — would violate Rule 23's explicit pronouncement that certification orders are subject to later modification.  Plaintiffs' citation to the United States Supreme Court's decision in *Smith v. Bayer Corp.*, 564 U.S. 299 (2011) is also inapt.  In that decision, the Court held that a federal court had exceeded its authority under the Anti-Injunction Act in enjoining a state court from considering the certification of a class in a products liability action that was largely identical to

71

one in which the federal court had denied certification.  The case turned on whether the federal

court's prior decision had a preclusive effect on the state court.  The Court held that "[n]either a

proposed class action nor a rejected class action may bind nonparties.  What does have this effect

is a class action approved under Rule 23."  *Id.* at 315.  The Court also stated that it expects

"federal courts to apply principles of comity to each other's class certification decisions."  *Id.* at

317.  Although Plaintiffs seek to apply this quoted language here, the context is entirely

different.  *Bayer* was a case concerning the application of federal-state comity to a state court

copycat lawsuit where certification was initially denied by the federal court.  It was not a motion

for decertification of a class certified in the same lawsuit before venue was transferred from one

federal court to another by order of the Multidistrict Panel.  In addition, the doctrine of comity is

not a rule of issue preclusion, but rather one of deference.  *Smentek v. Dart*, 683 F.3d 373, 377

(7th Cir. 2012) (stating that, after the decision in *Bayer*, "[w]e are left with the weak notion of

'comity' as requiring a court to pay respectful attention to the decision of another judge in a

materially identical case, but no more than that even if it is a judge of the same court or a judge

of a different court within the same judiciary").  While the Alabama certification order is entitled

to deference, it is clearly not entitled to preclusive effect given the language in Rule 23(c)(1)(C).

### b.    Standard of Review and Analysis

The question of which party has the burden on a motion to decertify a previously certified

class is not settled.  Some courts assign the burden to the proponent of the decertification motion.

*See, e.g.*, *Doe v. Karadzic*, 192 F.R.D. 133, 136-37 (S.D.N.Y. 2000) (holding that "the Court

may not disturb its prior findings absent 'some significant intervening event,'" and defining as

significant the same events that would justify a motion for reconsideration, i.e., "an intervening

change of controlling law, the availability of new evidence, or the need to correct a clear error or

prevent manifest injustice"); *In re Atl. Fin. Fed. Securities Litig.*, Civ. A. No. 89-645, 1992 WL 50072, *2 (E.D. Pa. Feb. 28, 1992) ("[W]hen seeking decertification of a class, the defendant bears a heavy burden to show that there exist clearly changed circumstances that make continued class action treatment improper.").   Other courts look to whether the plaintiff has carried the burden of showing a continued right to proceed as a class.   *See, e.g.*, *Marlo v. United Parcel Service, Inc.*, 639 F.3d 942, 947 (9th Cir. 2011) (holding that "as to the class-decertification issue," the party seeking certification continues to bear the burden of showing compliance with Rule 23); *In re Credit Suisse First Boston Corp. (Lantronix, Inc.) Analyst Securities Litig.*, 250 F.R.D. 137, 140 (S.D. N.Y. 2008) ("In order to decide whether or not to decertify this class, the Court must determine whether Plaintiff has carried his burden of demonstrating that each element of Rule 23 is met by a preponderance of the evidence."); *Walker v. Bankers Life & Cas. Co.*, Civ. A. No. 06-6906, 2008 WL 2883614, at *9 (N.D. Ill. July 28, 2008) (holding that "plaintiffs bear the burden of producing a record demonstrating the continued propriety of maintaining the class action"); *see also* Newberg on Class Actions § 7:39 (5th ed.) (collecting cases).   Assigning the burden to either party here, however, leads to the same result.

Defendants have met their burden to show that decertification is appropriate since (1) the Alabama certification order did not originally comply with the requirements of Fed. R. Civ. P. 23(c)(1)(B), and (2) the law governing the consideration of class certification has changed in the intervening years so that the record undergirding the Alabama certification order would no longer be deemed sufficient.   On the other hand, Plaintiffs, to the extent that they hold the laboring oar, have not met their burden to show continued compliance with Rule 23.   With the advent of *Duke*, *Comcast*, *Hydrogen Peroxide*, and *Blood Reagents*, all decided after the original certification order was entered, commentators note that the federal class action has become far

more challenging to certify.  *See, e.g.*, Linda S. Mullenix, Ending Class Actions As We Know Them: Rethinking the American Class Action, 64 Emory L.J. 399 (2014); Edward D. Cavanagh, Antitrust Law and Economic Theory: Finding A Balance, 45 Loy. U. Chi. L.J. 123, 159-60 (2013) (noting that, under these decisions, certification proceedings have "become something of a cottage industry for expert economists. As a result, class certification proceedings have been transformed into complex miniature trials, a practice roundly condemned by the Supreme Court three decades ago").  The requirement of rigorous analysis, the ability to engage in an examination of the merits of the claim where needed, and the imperatives to establish that predominance is susceptible to common proof and that damages can be measured on a class-wide basis tied to each theory of antitrust impact, simply did not exist when the Alabama certification order was entered.  Through no fault of the judge that entered it, that order is now deficient in numerous respects.

First, contrary to *Dukes*, the Alabama certification order specifically states that "the Court may not inquire into the merits of Plaintiffs' claims at this preliminary stage."  *Compare* Alabama certification order at 8; *Dukes*, 564 U.S. at 351.  Second, it does not specifically employ the preponderance of the evidence standard.  *See Hydrogen Peroxide*, 552 F.3d at 320 (citing *Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 365 (4th Cir. 2004)).  Third, it did not resolve concededly disputed evidence, concluding instead that Plaintiffs had met their burden by merely providing some evidence on an issue.  *See* Alabama certification order at 12 (finding antitrust standing sufficiently demonstrated by "substantial, although disputed, evidence".)  Finally, it made no attempt to analyze competing expert submissions on the predominance issue before granting certification, deferring that issue to a later stage of the litigation.  (*Id.* at 26

(stating "In the face of Plaintiffs' evidence and their expert's analysis, I find that, at least at this stage, the Plaintiffs have carried their burden of establishing predominance.").)

Having rigorously analyzed the certification record, and having found it wanting in the key respects discussed *supra*, the Motion for decertification in *Express Scripts* and *Medco* is granted.

## VI.    The certification Motion in *Brady*

Similar to *Caremark*, Plaintiffs in *Brady* seek to certify a class consisting of pharmacies that contracted or were under contract with Medco to dispense and sell brand name and generic prescription drugs for any prescription drug benefit plan.  (*See* ECF 57.)  Plaintiffs allege an antitrust conspiracy essentially identical to the Plan Sponsor conspiracy alleged by Plaintiffs in *Caremark*.  Also similar to *Caremark*, Plaintiffs rely on the expert reports submitted by Dr. Cowan.  (*See* ECF 45-2 (appending Cowan Rebuttal Report to Pls.' Joint Resp. to Defs.' Suppl. Mem. in Opp. to Pls.' Mot. for Class Cert.).)  Because the conspiracy alleged in *Brady* is judged under the rule of reason, the same *Daubert* defects and substantive class certification predominance issues identified in the discussion of the *Caremark* Plaintiffs' rule of reason claim prevent certification of *Brady* Plaintiffs' claim.

## VII.    Conclusion

Rigorous analysis of pending class certification Motions leads to the conclusion that Plaintiffs' expert submissions fail to pass *Daubert* scrutiny and that Plaintiffs are unable to meet their burdens under Rule 23.  Accordingly, Caremark's Motion to exclude expert evidence shall

be granted, Plaintiffs' Motions for class certification in the lead case and in *Brady* shall be denied, and the class previously certified in *Express Scripts* and *Medco* shall be decertified.

An appropriate Order follows.

BY THE COURT:


/s/ C. Darnell Jones, II
C. Darnell Jones, II   J.

**MDL 1782**

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

AUG 24 2006

FILED
CLERK'S OFFICE

*RELEASED FOR PUBLICATION*

*DOCKET NO. 1782*

*BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION*

*IN RE PHARMACY BENEFIT MANAGERS ANTITRUST LITIGATION*

*BEFORE WM. TERRELL HODGES, CHAIRMAN, D. LOWELL JENSEN, J. FREDERICK MOTZ,[*] ROBERT L. MILLER, JR.,[*] KATHRYN H. VRATIL, DAVID R. HANSEN AND ANTHONY J. SCIRICA, JUDGES OF THE PANEL*

*TRANSFER ORDER*

This litigation presently consists of six actions listed on the attached Schedule A as follows: two actions each in the Northern District of Alabama and the Eastern District of Pennsylvania and one action each in the Northern District of California and the Northern District of Illinois. Before the Panel is a motion, pursuant to 28 U.S.C. § 1407, by plaintiffs in one Pennsylvania action seeking centralization of all actions in the Eastern District of Pennsylvania. Plaintiffs in the California action support the motion. Medco Health Solutions, Inc. (Medco), its former parent Merck & Co., Inc., (Merck) and PAID Prescriptions LLC (PAID)[1] support centralization of the actions in which they are defendants (three of the six actions before the Panel) in the Eastern District of Pennsylvania. The Alabama and Illinois plaintiffs agree that centralization is appropriate, but suggest the Northern District of Alabama as transferee district. Defendants ExpressScripts, Inc.; Caremark RX and Caremark Inc.; and AdvancePCS[2] oppose centralization. If the Panel deems centralization appropriate, they suggest selection of the Northern District of Illinois as transferee district.

On the basis of the papers filed and hearing session held, the Panel finds that the actions in this litigation involve common questions of fact, and that centralization in the Eastern District of Pennsylvania will serve the convenience of the parties and witnesses and promote the just and efficient conduct of the litigation. All actions arise out of allegations that certain conduct by the pharmacy benefit manager (PBM) defendants–including the negotiation of rates for the sale of prescription drugs

---

[*] Judges Motz and Miller did not participate in the decision of this matter.

[1] Merck and Medco inform the Panel that PAID has merged with Medco and is no longer a separate entity.

[2] AdvancePCS has been recently acquired by Caremark RX and is now known as CaremarkPCS.

OFFICIAL FILE COPY IMAGED AUG 24 2006

- 2 -

by retail pharmacies–violated the federal antitrust laws. Centralizing these actions is desirable in order to avoid duplication of discovery, prevent inconsistent or repetitive pretrial rulings (especially on the issue of class certification), and conserve the resources of the parties, their counsel and the judiciary. *See In re Managed Care Litigation*, 2000 U.S. Dist. LEXIS 15927 (J.P.M.L. Oct. 23, 2000).

Opposing defendants argue that unique questions of fact relating to each PBM should produce a different result. We are unpersuaded by this argument. While the contracts between each plan sponsor/PBM will spawn some unique discovery, all plaintiffs allege that these contracts create a price-fixing conspiracy. Moreover, all actions can be expected to focus on similar PBM practices and procedures. Some plaintiffs also allege that the PBMs conspired with each other to further the price-fixing conspiracies. Transfer to a single district under Section 1407 has the salutary effect of placing all actions before one court which can formulate a pretrial program that: 1) allows pretrial proceedings with respect to any non-common issues to proceed concurrently with pretrial proceedings on common issues, *In re Multi-Piece Rim Products Liability Litigation*, 464 F.Supp. 969, 974 (J.P.M.L. 1979); and 2) ensures that pretrial proceedings will be conducted in a manner leading to the just and expeditious resolution of all actions to the overall benefit of the parties. The MDL-1782 transferee court can employ any number of pretrial techniques–such as establishing separate discovery and/or motion tracks–to efficiently manage this litigation. In any event, we leave the extent and manner of coordination or consolidation of these actions to the discretion of the transferee court. *In re Equity Funding Corp. of America Securities Litigation*, 375 F.Supp. 1378, 1384-85 (J.P.M.L. 1974).

Given the geographic dispersal of constituent actions, any of the suggested transferee districts would be an appropriate transferee forum. We are persuaded that the Eastern District of Pennsylvania, where two actions are currently pending, has the experience to steer this litigation on a prudent course.

IT IS THEREFORE ORDERED that, pursuant to 28 U.S.C. § 1407, the actions listed on Schedule A and pending outside the Eastern District of Pennsylvania are transferred to that district and, with the consent of that court, assigned to the Honorable John P. Fullam for coordinated or consolidated pretrial proceedings with the actions pending there and listed on Schedule A.

FOR THE PANEL:

Wm. Terrell Hodges
Chairman

## SCHEDULE A

<u>MDL-1782 -- In re Pharmacy Benefit Managers Antitrust Litigation</u>

### <u>Northern District of Alabama</u>

*North Jackson Pharmacy, Inc., et al. v. Express Scripts Inc., et al.*, C.A. No. 5:03-2696
*North Jackson Pharmacy, Inc., et al. v. Medco Health Solutions, Inc., et al.*,
   C.A. No. 5:03-2697

### <u>Northern District of California</u>

*Mike's Medical Center Pharmacy, et al. v. Medco Health Solutions, Inc., et al.*,
   C.A. No. 3:05-5108

### <u>Northern District of Illinois</u>

*North Jackson Pharmacy, Inc., et al. v. Caremark RX Inc., et al.*, C.A. No. 1:04-5674

### <u>Eastern District of Pennsylvania</u>

*Brady Enterprises, Inc., et al. v. Medco Health Solutions, Inc., et al.*, C.A. No. 2:03-4730
*Bellvue Drug Co., et al. v. AdvancePCS*, C.A. No. 2:03-4731